522 A.2d 917

George **ALLGOOD**

v.

**STATE of Maryland.**

**No. 118, Sept. Term, 1986.**

Court of Appeals of Maryland.

March 24, 1987.

Gary S. Offutt, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Norman L. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ., and MARVIN H. SMITH and CHARLES E. ORTH, Jr., Associate Judges of the Court of Appeals of Maryland (retired), Specially Assigned.

CHARLES E. ORTH, Jr., Judge, Retired, Specially Assigned.

Marion Harris was found dead in his home. He died as a result of blunt trauma to the head. The manner of death was homicide. He had been robbed.

The investigation of the crime by the police led them to George M. Allgood. He was arrested and charged with the first degree murder of Harris, robbery with a deadly weapon, and related offenses.

## THE PLEA AGREEMENT, ITS BREACH BY THE DEFENDANT AND ITS REPUDIATION BY THE STATE

Warren Brown, an Assistant State's Attorney for Baltimore City, was assigned to prosecute the case. His investigation led him to believe that one Michael Walker was also involved in the crimes. He learned that Walker, as Brown put it,

> was known to Juvenile Court. He had a very assaultive history, and those assaults all seemed to be about people's heads. He assaulted his grandmother. He was committed to Sheppard Pratt after assaulting a man with a board, puncturing a man's head, a cab driver. He was committed to Crownsville after assaulting his grandmother about the head. I felt as though this was a prime target.

But Brown was unable to uncover evidence sufficient to establish Walker's participation in the crimes. Brown felt that Walker should be brought before the bar of justice but that Walker was going "to remain on the streets unless we took some draconian action...." The "draconian action" Brown took was to enter into plea agreement negotiations with Allgood and his counsel, David Ellis. A bargain was reached. Its terms are reflected in a document entitled "Plea Agreement" which read as follows:

> The Defendant, George Allgood, in case # 18335307–11, agrees to testify truthfully before the Grand Jury and in all criminal proceedings against those suspected and or charged with the murder of Mr. Marion Harris on or

about November 16, 1983, in Baltimore City. In addition to testifying truthfully as stated heretofore, George Allgood also agrees to testify to everything he remembers or should reasonably remember regarding the murder of Mr. Marion Harris. George Allgood also agrees to reveal to the State's Attorney Office of Baltimore City, prior to any sworn testimony the truth concerning the murder of Mr. Marion Harris leaving nothing out that he reasonably should remember.

The State's Attorney's Office for Baltimore City, as considerations for the above, agrees to proceed against George Allgood only on the charge of manslaughter. This office also agrees to a suspended sentence along with a probationary period in lieu of any sentence involving actual incarceration after he enters a guilty plea to manslaughter in the case involving the death of Mr. Marion Harris. Further, this office will recommend the release of George Allgood from jail to the U.S. Navy on June 11, 1984. Finally, this office will write a letter to the U.S. Navy citing George Allgood's cooperation in pursuing the conviction of those responsible for the murder of Mr. Marion Harris.

The plea agreement called for the signatures of the Assistant State's Attorney, Allgood and defense counsel, but it was undated and unsigned for reasons that will later appear.

Pursuant to the agreement, Allgood gave a statement to Brown and testified before the Grand Jury. It seems that his statement to Brown and his testimony under oath before the Grand Jury were substantially the same. We give a compendium of his testimony before the Grand Jury as revealed by a transcript of the proceedings. Allgood was a seaman, absent without leave from the United States Navy. He had lived briefly with Harris "[i]n my adolescence" upon the death of his mother and referred to Harris as his "godfather." On the night of the murder he went to Harris's home. Harris was alone. While they were talking the doorbell rang, "I asked him did he want me to answer

the door. He gave me permission, so I did." Allgood looked out a window and saw Walker and another person. He told Harris who was at the door and Harris said, "Open up the door, then." Walker and his companion entered the house. They all went into the kitchen. After about five or ten minutes of small talk, the conversation got around to money. Walker asked if Allgood would loan him some money and Allgood said that he did not have any. Walker asked Harris for a loan and Harris said he did not have any money at all.

Michael Walker asked my godfather could he use the phone. Michael Walker went over to use the phone. He didn't touch the phone. He picked up a hammer on the table and I heard a motion as I looked up. Next thing, Michael Walker was standing to the right of my godfather, just hitting him in the head with the hammer. Harris fell to the floor. Walker was standing over him and Allgood tried to push him away. Walker's companion started to rifle Harris's pockets. Walker was still striking Harris with the hammer. Allgood said to Walker, "Why don't you get [obscenity] out of here." Walker said, "If you know what is best, you shut your mouth up." Allgood said that he was going to call the police. Walker said, "Man, if you know what's best you better just walk." Allgood "went out the door." Allgood said that he did not call the police because he was "like shook up after that." He went to the home of his girlfriend with whom he was staying. He had blood on his clothing which he explained by stating that he had been with someone who was stabbed. He tried to wash the blood stains out of his clothes. When he was arrested he denied having seen Harris for two weeks prior to the murder. "[The police] were pointing a finger at me. They didn't care about who else." He did not tell anyone what happened; he was afraid of Walker but planned to take revenge himself.

Even before Allgood appeared before the Grand Jury, Brown began to have doubts about the truthfulness of Allgood's story. The doubts were triggered by two close

relatives of Harris. Brown had called Harris's grandson to explain the plea agreement and why the "deal" had been made. He recounted Allgood's story about what had occurred. Within 30 seconds the grandson called back. He told Brown that "there is something that doesn't make sense. He said, my grandfather would never tell anybody to answer the door." Later, Brown called the grandson's mother, and, after ascertaining that she had not talked to her son, started to tell her what Allgood had said. When Brown

> got to the point of telling her that George Allgood had said that Mr. Harris instructed him to answer the door, she also said, no, that doesn't make any sense; he doesn't do that.
>
> She went on to say there were times when the house was full of people and someone had knocked on the door, and he would say, emphatically, no, nobody answers my door.

This raised questions in Brown's mind whether Allgood was telling the truth as agreed, but he had no hard evidence that Allgood was lying. He took Allgood before the Grand Jury to testify under oath, with the warning that if he did not tell the truth he could be charged with perjury. It did not alleviate Brown's doubts that Allgood's version of what happened did not change. In the light of Brown's uncertainty as to whether Allgood was abiding by the agreement, it was proposed that Allgood take a polygraph test. Allgood agreed, but at a price.

Allgood was being detained at the Baltimore City Jail on a "no bail status" awaiting trial. He wanted to be transferred to the custody of the navy (he was AWOL) pending the taking of the test. In the words of Brown:

> Otherwise, [Allgood] wanted to go to trial immediately. He was tired of sitting in City Jail. He didn't mind taking the polygraph, but he didn't want to sit in City Jail a month, waiting for it to be taken. So we said that he would go to the Navy, with the understanding, when he was required to take the polygraph, he would [take it],

but if he failed the polygraph, back to the City Jail he goes.

The State filed a "Petition for Transfer of Custody," requesting that custody of Allgood be transferred from the Baltimore City Jail to the U.S. Navy. It set out that Allgood was charged with murder and was detained at the Jail under "No Bail Status." If released to the custody of the U.S. Navy, he would be held pursuant to a detainer filed by the Baltimore City Police Department. He would be brought back at the request of the State's Attorney's Office, Baltimore City, "for the purpose of a polygraph at place and time to be designated by said office." The petition concluded:

Should polygraph results reveal that George Allgood is not telling the truth about his lack of criminal involvement in the aforementioned murder that he will be remanded immediately to the appropriate Baltimore City authorities for return to the Baltimore City Jail under the No Bail Status that he is presently under.

The court ordered the transfer subject to the conditions and specifications in the petition.

Subsequently Allgood took the polygraph test. He failed. The results of the test indicated deception in response to questions regarding Allgood's intent to answer truthfully any inquiries about the robbery and murder, his knowledge of the robbery, his complicity in the plan to rob, and his hope that error would be made on the test regarding the victim's death. The results of the polygraph test, considered with "the entire nature of the case" as it had evolved, caused the State to disbelieve Allgood's story and to deem the plea agreement breached by him.

In the meantime, Brown, the prosecutor originally assigned to the case, had resigned, and Mark P. Cohen, an Assistant State's Attorney, was designated to proceed with the prosecution. He wrote the defense attorney "to officially notify you that there is *no* plea agreement concerning this murder case between the State and your client, George Allgood." (Emphasis in original.) Cohen explained:

The previous Assistant State's Attorney who handled this case, Warren Brown, had discussed a plea agreement with you concerning this case which was predicated upon your client successfully passing a polygraph examination administered by Corporal Sheldon of the Maryland State Police. As you are aware, on July 3, 1984, your client took a polygraph examination and Corporal Sheldon found that your client's answers indicated deception.

Accordingly, your client's failure to pass the polygraph examination is a material breach of any plea agreement and renders such agreement null and void. The State intends to call for trial this case as well as the case of the co-Defendant, Michael Walker, on Indictment Nos. 18417201–03 on September 11, 1983 in Part 3. Furthermore, the State intends to take the steps necessary to have George Allgood returned from the Navy to the Baltimore City Jail pending the trial on September 11, 1984.

Allgood filed a pretrial "Motion for Enforcement of Plea Agreement." The court conducted a plenary hearing and denied the motion. Trial proceeded in the Circuit Court for Baltimore City before a jury. Allgood's testimony before the Grand Jury was admitted in evidence. Allgood was convicted of felony murder and robbery with a deadly weapon. He was sentenced to life imprisonment on the murder conviction and to two years imprisonment on the robbery conviction, the sentences to run concurrently. On direct appeal, in an unreported opinion, the Court of Special Appeals affirmed the judgment entered on the murder conviction. It vacated the sentence imposed on the robbery conviction on the ground that the conviction of the underlying felony merged into the conviction of felony murder. We granted Allgood's petition for a writ of certiorari, accepting the two questions presented by him:

1) Did the trial court err when it denied Petitioner's Motion to Enforce Plea Agreement?

2) Did the trial court err when it admitted grand jury testimony obtained from Petitioner as partial performance of the plea bargain the State repudiated?

We have heretofore considered the role plea bargains now play in the administration of both this State's and the nation's criminal justice system. *State v. Brockman,* 277 Md. 687, 692–693, 357 A.2d 376 (1976). We concluded that "plea bargains, when properly utilized, aid in the administration of justice and, within reason, should be encouraged." *Id.* at 693, 357 A.2d 376. We have adopted a rule setting out the procedures to be followed and the conditions to be observed regarding plea bargains. Maryland Rule 4–243. This Court and the Court of Special Appeals have been concerned with various aspects of a plea agreement in a number of cases in addition to *State v. Brockman, supra.* *See,* for example, *Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986); *Blinken v. State,* 291 Md. 297, 435 A.2d 86 (1981), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2235, 72 L.Ed.2d 846 (1982); *Miller v. State,* 272 Md. 249, 322 A.2d 527 (1974); *Brent v. State,* 63 Md.App. 197, 492 A.2d 637 (1985); *Banks v. State,* 56 Md.App. 38, 466 A.2d 69 (1983); *Epps v. State,* 52 Md.App. 308, 450 A.2d 913, *cert. denied,* 294 Md. 622 (1982); *McCormick v. State,* 38 Md.App. 442, 381 A.2d 694 (1978); *Gray v. State,* 38 Md.App. 343, 380 A.2d 1071 (1977), *cert. denied,* 282 Md. 732 (1978); *Wynn v. State,* 22 Md.App. 165, 322 A.2d 564 (1974). The first question in the appeal before us, however, involves none of the philosophical views or procedural and legal niceties with respect to plea agreements. It boils down simply to a determination of the terms of the agreement, that is, on what precisely did the minds of the parties meet.

The circumstances resulting in the plea agreement and the happenings leading to its repudiation by the State were brought out in the hearing on the Motion for Enforcement of Plea Agreement and are not in dispute. Confusion arises with respect to the interrelationship of the plea agreement,

the polygraph test, and Allgood's release to the custody of the navy.

## THE HEARING ON THE MOTION TO ENFORCE THE AGREEMENT

Brown, the original prosecutor, testified at length at the hearing. He insisted that he never said or intended that the polygraph test was a part of the plea agreement. The plea agreement had been reached before the polygraph test was proposed. The test "was simply a means of determining whether [Allgood] was living up to the terms of the agreement." In other words, it was to measure whether or not Allgood had been truthful as he had agreed to be in order to be entitled to reap the benefits promised in the agreement. Allgood's release to the navy was to get him to take the test. Brown stated this view throughout his testimony.

The polygraph was to determine whether [Allgood] was telling the truth or not. The purpose of determining whether he was telling the truth or not was to determine whether we were bound by the [plea] agreement. The purpose of allowing him to stay out of City Jail and in the custody of the Navy was to facilitate the taking of the polygraph.

Brown put it more succinctly a little later:

I would not have agreed to the polygraphing of [Allgood] just for the sake of the polygraph. The purpose of the polygraph was to determine whether [Allgood] was telling the truth or not, and if he was telling the truth, then we were bound. If he wasn't, then we weren't bound, and that was the end of it.

Brown reiterated his view again under persistent questioning:

[I]t's very clear in my mind that the purpose of [Allgood's] being in the custody of the Navy was to facilitate the taking of the polygraph, and the purpose of the polygraph was to determine whether he was lying or not, and the purpose of determining whether he was lying or

not was to determine whether we were bound by the agreement.

Brown explained why the written plea agreement was never signed:

The agreement was ideally the terms that we were willing to agree to and also those that Mr. Allgood was willing to agree to, and ... the agreement basically was that he would testify truthfully and give us, tell us the truth about what happened. This was never executed because between the time it was drafted and the time that it would have been signed, there was again some concerns about whether he was telling us the truth or not, and those concerns were to be resolved by way of a polygraph. After the results of the polygraph, there wasn't any need for this to be executed because the deal at that time was off.

David Ellis, defense counsel, did not testify at the hearing. His position, gleaned to some extent through the questions he posed to the witnesses and mainly from his argument to the court, was that the polygraph test was not part of the plea agreement and that its results were to play no role whatsoever in establishing whether Allgood had lived up to the plea agreement. His understanding was that the sole purpose of the test was to determine whether Allgood was to await trial in jail or in the navy brig. That was why he agreed to permit Allgood to take the test. The test was not part of the "deal." Otherwise, he would not have agreed, because there was no tangible evidence whatsoever, as the matter stood before the test, that Allgood was lying. In any event, Ellis argued, Allgood had substantially performed everything he was able to do. Brown, Ellis urged, got 95% of the truth out of Allgood and that was enough to satisfy the agreement. As we have noted, Ellis's position was not presented to the court by way of any testimonial evidence by him, but primarily through his argument. The only evidence to support Ellis's view came from two of his former law clerks. One of them gave her

recollection of what had occurred during a conference in the judge's chambers.

Mr. Brown said that he wanted Mr. Allgood to take a polygraph. Mr. Brown was not comfortable with what was going on with releasing [Allgood] to the Navy. He was just uncomfortable about it, and he wanted [Allgood] to take the polygraph examination, and Mr. Ellis said that was fine with him but that it was not part of the deal.

This was reflected in notes she had taken at the conference and admitted in evidence. The notes also contained a line, "[There is] no evidence that [Allgood is] not telling the truth."

The other law clerk had helped draft the petition to transfer Allgood to the custody of the navy. He testified:

My concept of the meaning of the petition was that George Allgood was to be—his custody was to be transferred to the United States Navy, and as a condition of that transfer, as a condition of his remaining with the United States Navy pending any further hearings in his or Michael Walker's matters, he would have to take a polygraph, concerning his testimony before the Grand Jury and concerning what he had told the State's Attorney, basically, and if he was to pass that polygraph, he would stay with the Navy. If he did not pass the polygraph then he would be turned over to the custody of the Baltimore City Jail.

He was asked about the relationship between the plea agreement and the petition to transfer custody. He said: "Well, the addition of the transfer of custody has nothing to do with the plea agreement, itself. That is my recollection of the entire incident." With respect to the plea agreement he said:

As far as the plea agreement itself, we had reached an agreement and it was originally that Mr. Brown was going to be responsible for writing up a copy, and then there was a provision for placing it on the record in ... court.

The clerk's recollection was that this was thereafter changed so that the agreement would be placed on record after Allgood testified. Later, he said, Brown told him that the agreement had been written up but it was not necessary to turn it over to defense counsel because "[n]obody was going to sign it. It was not to be submitted to the court."

Allgood testified at the hearing. He said that the plea agreement was "that if I was to come straight out, say what happened [at the time of the murder], that I would be released to the custody of the Navy." Asked what effect the plea agreement had on his prosecution, he said that he "would come to trial and turn State's evidence." He would "get ten years suspended sentence and five years probation." He was to plead guilty to manslaughter. The transcript of his cross-examination reads:

Q. Mr. Allgood, you started to say that part of the plea agreement was that you had to take a polygraph; isn't that right?

A. Yes.

Q. And what was to happen if you flunked the polygraph?

A. That ... the agreement would be taken away.

## THE OPINION OF THE TRIAL COURT

■ In denying the Motion for Enforcement of Plea Agreement, the hearing judge delivered an opinion from the bench. He put his finger on the key to the controversy at the beginning of his opinion. He said:

The question ... which is presented here is whether or not there was an agreement prior to the State's withdrawal of its plea agreement, whether there was an agreement that a polygraph would be taken, and that the parties would be guided by the results of that polygraph.

As was his obligation as the fact finder, the judge resolved the conflicts in the evidence with respect to these issues. He found that there *was* a plea agreement prior to its withdrawal by the State, that there *was* an agreement that

a polygraph be taken, and that the parties *were* to be guided by the results of that polygraph. He obviously accepted Brown's version as the correct one. He said:

> Mr. Brown's testimony in substance ... boils down to there being an agreement struck, and a part of that agreement was that Mr. Allgood would testify truthfully before the Grand Jury. And that sometime thereafter, doubt developed as to Mr. Allgood's truthfulness, and it was then agreed that a polygraph would be administered to Mr. Allgood. Obviously the purpose and expressed purpose was that a favorable result would impose on the State the burden to keep its agreement, and on the contrary, that an unfavorable result would ... put the State in the position that it could have the option of not pursuing the agreement.

On the evidence before the court, set out above, this judgment was not clearly erroneous, and we may not set it aside. Rule 886.

There was no contention at the hearing that the polygraph test was other than unfavorable to Allgood. The report of the polygraph examiner was received in evidence. It is clear on its face that the results of the examination were not favorable to Allgood. It can only be construed as showing that Allgood "failed" the test. It was the opinion of the examiner that Allgood was deceptive in answering five key questions concerning the crime, including "[r]egarding that robbery and murder [of Harris] do you intend to answer truthfully each question about that?"

It follows that the repudiation of the plea agreement by the State was not improper. By failing the polygraph examination, Allgood was not entitled to the enforcement of the plea agreement. Therefore, the trial court did not err in denying Allgood's motion to enforce it.

The judgment of the court was not in conflict with the court's assertion that

polygraph results play no part in determining, as far as the Court is concerned, determining truthfulness or the absence of truthfulness.

In resolving whether Brown's view or Ellis's view was correct, the court was not concerned with the veracity *vel non* of Allgood. The issue before the court was not whether Allgood was, in fact, telling the truth and thereby complying with an underlying obligation to tell the truth, but whether the parties had agreed to abide by the results of the polygraph test in determining the viability of the plea agreement. Therefore, the status of polygraph evidence in our administration of criminal justice was immaterial. But see, *Guesfeird v. State*, 300 Md. 653, 658, 480 A.2d 800 (1984); *Kelley v. State*, 288 Md. 298, 302, 418 A.2d 217 (1980); *Reed v. State*, 283 Md. 374, 380–389, 391 A.2d 364 (1978); *Lusby v. State*, 217 Md. 191, 194–195, 141 A.2d 893 (1958).

We note that the judgment on the decisive issues was sound whether the provision to take the polygraph examination was a part of the original plea agreement or was a subsidiary agreement subsequent to the plea agreement. In any event, the court found that it was "a part of the overall agreement between the State and the defendant relative to the plea bargain," and this was not clearly erroneous.

The judge gave an alternative reason why Allgood was not entitled to the enforcement of the plea bargain. He observed that a term of the plea agreement required that Allgood "reveal to the State's Attorney's Office of Baltimore City, prior to any sworn testimony, the truth concerning the murder of Mr. Marion Harris, leaving nothing out that he reasonably should remember." He concluded "from the testimony ... that there was a breach of this portion of the agreement which standing alone would be grounds for invalidating the agreement." He asserted:

It is uncontradicted that statements made to Mr. Brown by Mr. Allgood were not true.

At the conclusion of the judge's opinion, defense counsel promptly challenged this statement. He claimed that

There is no, absolutely no evidence other than the polygraph test which you had indicated at the beginning of your statement that that would not control this Court. Other than that, there is no evidence that I am aware of that my client lied to Mr. Brown or the State's Attorney or the Grand Jury or anybody else.

The judge did not elaborate on his challenged assertion. All he said was: "I think the record is clear."

It may well be that the judge was clearly erroneous in his alternative reason. The evidence does not support his acceptance that "statements made by Mr. Brown to Mr. Allgood were not true." In light of the judge's declaration that polygraph results would "play no part in determining, as far as the Court is concerned, truthfulness or the absence of truthfulness," defense counsel was correct; there was no other tangible evidence that Allgood was lying. Brown recounted what Harris's relatives told him was Harris's fixation about answering the door. This may have been enough to raise doubts about Allgood's version, but, as Brown's pursuit of the matter indicated, it was not sufficient to satisfy that Allgood was, in fact, lying. We note that neither of the relatives testified at the hearing. Technically, it may be correct that it was not contradicted that what Allgood told Brown was not true, but there was no evidence adduced, discounting the results of the polygraph examination, legally sufficient to establish that Allgood was not truthful. If he was in fact lying, it was up to the State to prove it, and it did not do so under the condition described by the court. In any event, we base our decision on the first reason stated by the court and, thus, we do not reach the second reason. Whether the court was right or wrong as to its alternative reason is not pertinent to our resolution of this appeal.

It will be recalled that defense counsel argued at the hearing that if Allgood did not tell the whole truth, any false statements he made were not substantial enough to

warrant repudiation of the plea agreement. He claimed that 95% of what Allgood had given the State was the truth and that, he urged, was sufficient to satisfy the agreement. But whether Allgood had substantially performed his promises under the plea agreement was not the issue as the motion was decided. The hearing court found that the enforceability of the agreement depended on the results of the polygraph test, and when Allgood failed the test he lost his entitlement to have the plea agreement enforced. The hearing judge had no need to address the matter of substantial performance (he distinguished *State v. Brockman, supra,* however, upon which Allgood relied), nor do we.[1]

## THE RECEIPT IN EVIDENCE AT THE TRIAL ON THE MERITS OF ALLGOOD'S GRAND JURY TESTIMONY

Prior to the trial on the merits the State announced that it proposed to offer Allgood's testimony before the Grand Jury in its case in chief. Defense counsel objected. He claimed that "the Grand Jury testimony is not admissible in any event." When the State proffered the transcript of the Grand Jury testimony at trial, the court admitted it over the objection of defense counsel.

The Court of Special Appeals, in its unreported opinion, held that the trial court did not err when it admitted the Grand Jury testimony into evidence at the trial on the merits. It relied on *Ball v. State,* 57 Md. App. 338, 365–366, 470 A.2d 361 (1984). It said:

We hold, as we did in *Ball,* that the statements made by appellant in connection with the plea agreement were admissible against him at trial after the agreement had been terminated because of his breach. His testimony before the grand jury was voluntary and admissible. He

---

1. We observe that if Allgood had been successful in his motion, the result would have been that the State was obliged to present the agreement to the court. The court could reject the plea agreement in whole or in part. Rule 4–243(c)(1), (2), (4) and (5).

had been warned, prior to testifying before the grand jury, that he was not required to incriminate himself and that his testimony could be used against him if he subsequently went to trial on the pending charges.

The case reported as *Ball v. State* actually involved two defendants in addition to Sheldon Savior Ball—Joseph Melvin Wright and Kenneth D. Coley. Each of them sought a writ of certiorari. We denied Ball's petition. 300 Md. 88, 475 A.2d 1200 (1984). We granted Coley's petition, *id.*, and Wright's petition, *id.* at 90, 475 A.2d 1202, and decided their cases in one opinion, reported as *Wright v. State*, 307 Md. 552, 515 A.2d 1157 (1986). We reversed as to Wright, and affirmed as to Coley. We look to that part of our decision with respect to Coley, for it concerned "the admissibility in evidence of a plea agreement entered between the State's Attorney and . . . Coley, and Coley's confession pursuant to that agreement." *Id.* at 555, 515 A.2d 1157.

The gist of the agreement was that Coley promised to give a full statement and testify before the grand jury and at trial in return for the State's promise to accept a plea of guilty to second degree murder. The plea agreement stated that if Coley broke his promise, the State could use any of his statements against him. . . . Coley testified before a grand jury.

Later Coley reneged on his part of the plea agreement, elected to stand trial on a not guilty plea, and moved to suppress all of his statements on grounds of involuntariness. *Id.* at 579, 515 A.2d 1157.

Coley conceded that the police had complied with the dictates of *Miranda*, but claimed that the State had induced him to confess by agreeing to drop the first degree murder charge and accept a plea to second degree murder. The trial court denied Coley's motion, and, at trial admitted Coley's plea agreement, confession, and grand jury testimony despite repeated objections from Coley. Coley relied on the Maryland inducement rule set forth in *Hillard v. State*, 286 Md. 145, 406 A.2d 415 (1979), and other cases. *Id.* We reviewed our cases which developed and applied the induce-

ment rule. We found that it excluded from evidence a confession or statement by a defendant which was obtained by enforcement authorities through an "improper" inducement. *Id.* 307 Md. at 585, 515 A.2d 1157. Eldridge, J., for the Court, pointed out:

> It would be anomalous, however, to hold that the State's actions were "improper" when they are expressly authorized by law (i.e. Rule 4–243) and when the State neither rescinds nor breaches the plea bargain agreement. *Id.*

In addition, Judge Eldridge observed, Rule 4–243(d), on its face, does not contemplate that defendant's promises can be deemed per se involuntary on the ground that they were induced by the State's promises. *Id.*

The circumstances as to Coley were that the inducement took the form of promises under a negotiated plea bargain agreement, made in exchange for Coley's promises under that agreement. The agreement was sanctioned and regulated by Rule 4–243. The mutual promises were specifically authorized by the Rule. The State neither rescinded nor breached the agreement. Finally, the agreement specified that if Coley reneged, his inculpatory statements could be used against him at trial. *Id.* at 583–585, 515 A.2d 1157. In those circumstances, we did not believe that

> it would foster the policy favoring plea bargain agreements to hold Coley's statements inadmissible. On the contrary, it would likely have the opposite result, encouraging defendants to rescind consummated plea bargain agreements without justification. *Id.* at 587, 515 A.2d 1157.

We rejected Coley's urging that on "policy grounds" the inducement rule of *Hillard* should be extended to situations like those of Coley in order to encourage plea bargaining. *Wright* at 585–587, 515 A.2d 1157. In considering this notion, we examined numerous cases in other jurisdictions relied on by Coley. Some were to the effect that offers and statements made in plea bargain negotiations should not be admitted at trial. *Id.* at 586 n. 9, 515 A.2d 1157. Some held that defendants' statements made pursuant to plea agree-

ments rescinded or breached by the State should not be admitted. *Id.* n. 10. There were some which concluded that inculpatory statements should not be admitted when there was no showing that the defendant rescinded or breached the plea agreement. *Id.* n. 11. Some decided that statements made in connection with withdrawn guilty pleas should not be admitted. *Id.* n. 12. We further noticed Rule 11, Federal Rules of Criminal Procedure. We believed, however, that the cases relied on by Coley were entirely distinguishable from the circumstances in his case. *Id.* at 586, 515 A.2d 1157. We ascertained, on the other hand, that in situations analogous to those of Coley, "courts have held that defendants' inculpatory statements are admissible." *Id.* at 587 n. 13, 515 A.2d 1157.

The decisive difference between Coley's situation and that of Allgood is that the defendant reneged on the agreement in the former but the State terminated the agreement in the latter. In Coley's case, "the State neither rescinded nor breached the agreement." *Id.* at 586, 515 A.2d 1157. In Allgood's case the State flatly rescinded the agreement in a letter to defense counsel, and thereafter refused to submit it to the court. It proceeded to try Allgood on the murder and robbery charges despite his desire to plead pursuant to the agreement. Furthermore, the Coley agreement "specified that if Coley reneged, his inculpatory statements could be used against him at trial." *Id.* at 585, 515 A.2d 1157. The agreement with Allgood contained no such provision. Allgood answered "Yes" when he appeared before the Grand Jury to the question if he understood that "anything you say here can be used against you in a court of law." But this is far from an agreement that his statements could be used against him at trial. In fact, the accuracy of the question so broadly phrased is at least questionable.

In our rejection of Coley's importuning that we extend the inducement rule to include promises under plea agreements, we noted our accord with those cases relied on by Coley that held in effect that "defendants' statements made pursuant to plea agreements rescinded or breached by the

State should not be admitted. . . ." *Id.* at 586, 515 A.2d 1157. We said:

> We ... agree that defendants would be reluctant to enter plea bargaining agreements if the State court thereafter rescind or breach the agreements, and then use at trial the defendant's inculpatory statement made as part of the agreement or pursuant thereto. *Id.*

However, we carefully pointed out and stressed that in Coley's situation "[t]he State neither rescinded nor breached the agreement." *Wright,* 307 Md. at 585, 515 A.2d 1157. We iterated that fact shortly thereafter, *id.,* and reiterated it, *id.* at 586, 515 A.2d 1157. We emphasized that aspect in discussing the terms of the Coley agreement. In declaring that the State's actions could not be said to be improper when they are expressly authorized by Rule 4–243, we added *"and when the State neither rescinds nor breaches the plea bargain agreement."* *Id.* at 585, 515 A.2d 1157 (emphasis supplied).

## SUMMARY

■ The teachings of *Wright* are:

1) When statements are obtained from a defendant upon promises made him by the State by way of a plea bargain agreement, the statements, in the light of Rule 4–243, are not inadmissible *per se,* under the inducement doctrine, in the State's case in chief at trial on the merits.

2) When the State rescinds, repudiates, or breaches the plea bargain agreement, for whatever reason, after the statements are so obtained, the statements, as a matter of law, are inadmissible *per se* in the State's case in chief at trial on the merits.

*Wright* fully appreciated that promises to the defendant of the nature usually encompassed in plea bargain agreements certainly suffice to induce a statement obtained, so that, ordinarily, the inducement most assuredly would be improper. The intervention of a plea bargain agreement, however, expressly authorized by law, serves to make the inducement proper. Thus, the plea agreement, in itself,

does not render the statement inadmissible. On the other hand, *Wright* recognized the chilling effect on plea bargaining were the State permitted to enter into a plea agreement, obtain a statement thereunder, abort the agreement, and then use the statement in its case in chief at trial on the merits. The reason for the State's repudiation of the agreement is immaterial with respect to the admissibility of the statement. Whether its reason be sound or unsound, technical or substantial, in good faith or simply because the prosecutor had misgivings or a change of heart, or was utterly arbitrary, is of no matter. The justification *vel non* of the rescission, repudiation, or breach of the agreement by the State goes to whether the defendant is entitled to have the agreement enforced; it does not affect the admissibility of the statement obtained under it. This is in accord with the rationale of *Wright.*

## CASES IN OTHER JURISDICTIONS

The issue here, as we have seen, is what effect does a rescission, repudiation or breach by the State of a plea agreement, after a statement is obtained thereunder from the defendant, have on the admissibility of the statement in the State's case in chief at trial on the merits. We have not uncovered a case in another jurisdiction which persuades us that the view we adopted in *Wright* is not the proper one in the light of our declared policy to encourage plea bargaining. We discovered in deciding *Wright* that cases in other jurisdictions are distinguishable from Coley's case and provide but slight, if any, guidance. We have looked again for guidance without success.

The federal cases, for the most part, were decided in the light of a Federal Rule of Criminal Procedure. Rule 11(e)(6)(D) as it now stands, declares that, except for two exceptions not here relevant, evidence of

> any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn

is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions.[2] *See,* for example, *United States v. Washington,* 614 F.Supp. 144 (E.D.Pa.1985), *aff'd,* 791 F.2d 923 (3rd Cir.1986); *United States v. Mannino,* 551 F.Supp. 13, 15 (S.D.N.Y.1982). There is no provision comparable to FRCP 11(e)(6)(D) or its companion provision in FRE 410(4) in the Maryland Rules.[3]

---

**2.** The Rule has been amended from time to time to describe more precisely what evidence relating to pleas or plea discussions is admissible.

Rule 410 of the Federal Rules of Evidence parallels Rule 11 of the Federal Rules of Criminal Procedure.

**3.** Maryland Rule 733 (now Rule 4–243) was proposed by the Standing Committee on Rules of Practice and Procedure in its Fifty-third Report under date of 29 December 1975. The Report stated that in drafting the proposed Chapter 700 rules, it had "utilized a great deal of current reference material," including "the ABA Standards relating to the Administration of Criminal Justice" and the "Federal Rules of Procedure." In reference to proposed Rule 733, "Plea Agreements," it explained:

This Rule recognizes for the first time in a Rule, that the practice of "plea bargaining" exists and establishes a degree of control. The draft Rule encompasses the traditional types of plea agreements which involve pleas to specific counts and recommendations of State's Attorneys. The Rule adopts the ABA standard permitting the defendant and the State to present to the court, on the record, a plea agreement which incorporates a specific sentence or other disposition. If the court accepts the agreement, it is bound by the terms relating to sentence and disposition. If the court rejects the agreement, the defendant may withdraw his plea and stand trial before a different judge.

The present Rule 4–243 made no changes of substance in the provisions of former Rule 733 as adopted.

"Plea Discussions and Plea Agreements" were dealt with in the American Bar Association's *Standards Relating to the Administration of Criminal Justice* (1974), §§ 3.1–3.4. Section 3.4 read:

Discussion and agreement not admissible.

Unless the defendant subsequently enters a plea of guilty or nolo contendere which is not withdrawn, the fact that the defendant or his counsel and the prosecuting attorney engaged in plea discussions or made a plea agreement should not be received in evidence against or in favor of the defendant in any criminal or civil action or administrative proceedings.

The Rules Committee did not propose, and this Court has not adopted, a provision to the effect of ABA Standard 3.4 or Rule 11(e)(6)(D) of

Cases in other states afford little assistance. Some states have a rule comparable to the federal rules or the ABA Standard, and the question of the admissibility of statements obtained under the color of a plea bargain agreement is determined under their rule. *See,* for example, *Williams v. State,* 491 A.2d 1129, 1132 (Del.), *cert. denied,* — U.S. ——, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985); *Gillum v. State,* 681 P.2d 87, 88 (Okla.Crim.App.1984); *Stevens v. State,* 419 So.2d 1058, 1062 (Fla.1982), *cert. denied,* 459 U.S. 1228, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983); *State v. Jackson,* 325 N.W.2d 819, 822 (Minn.1982); *State v. Trujillo,* 93 N.M. 724, 725, 605 P.2d 232 (1980).

States, like Maryland, which have not adopted a rule as to the admissibility of statements relating to plea bargain agreements, or which have a rule which they deem to be inapplicable in the circumstances of a particular case, turn to the voluntariness *vel non* of the challenged statement. Some of the states declare the statements to be inadmissible *per se* if induced by a plea bargain. *See,* for example, *State v. Hoopes,* 534 S.W.2d 26, 35–37 (Mo.1976) (en banc).

Other states look to the totality of the circumstances to determine whether the statement is admissible. *See,* for example, *People v. Overturf,* 67 Ill.App.3d 741, 744, 24 Ill.Dec. 399, 400, 385 N.E.2d 166, 167 (1979); *State v. Hutson,* 537 S.W.2d 809, 811 (Mo.Ct.App.1976); *Taylor v. Commonwealth,* 461 S.W.2d 920, 922 (Ky.1970), *cert. denied,* 404 U.S. 837, 92 S.Ct. 126, 30 L.Ed.2d 70 (1971).

In *People v. Jones,* 416 Mich. 354, 359–363, 331 N.W.2d 406 (1982), *cert. denied,* 460 U.S. 1084, 103 S.Ct. 1775, 76 L.Ed.2d 347 (1983), a six-judge court agreed that the challenged statement was inadmissible. However, three judges thought that it was *per se* inadmissible as the product of a plea bargain. The other three opted for a rule which

the Federal Rules of Criminal Procedure or Rule 410 of the Federal Rules of Evidence.

determined admissibility on the totality of the circumstances.

We observe that we were aware when we decided *Wright* that we were going further in carving out an exception to the inducement doctrine than have other jurisdictions. Our present review of the cases indicates that other jurisdictions, federal and state, have, in the main, adhered to the inducement doctrine by rule or judicial decision and have not adopted an exception as we did in the light of our Rule 4–243. In any event, the circumstances in the case before us do not lend themselves to an application of the Coley exception in *Wright,* nor do they warrant an extension of that exception, even if we were of a mind to broaden it under more compelling circumstances.

## HOLDING

Under the teachings of *Wright,* we hold that Allgood's testimony before the Grand Jury was inadmissible. Therefore, the trial court erred in admitting it, and the error entitles Allgood to a new trial.[4]

In his brief Allgood argues that his statements were involuntary in the federal constitutional sense and that their admission violated the Fifth Amendment. A like assertion was made by Coley, but he did not raise the constitutional issue in his petition for certiorari nor was it presented in our order granting the writ. Consequently, the issue was not before us, Rule 813, and we did not address it. *Wright,* 307 Md. at 587, 515 A.2d 1157. We do not address it here either. It is the established policy of this Court that ordinarily we do not pass upon a constitutional question if there is also present some other ground upon which to dispose of the case. *Rutherford v. Rutherford,* 296 Md. 347, n. 6 at 363–364, 464 A.2d 228 (1983), and the "legion" of cases cited

---

4. Michael Walker was tried in the Circuit Court for Baltimore City subsequent to the trial of Allgood. He was convicted of the second degree murder of Harris and sentenced to 10 years. The other charges against him were nol prossed. He did not note an appeal.

by Chief Judge Murphy in his concurring and dissenting opinion thereto at 366–367. The policy is a venerable one. *See State v. Insley,* 64 Md. 28, 30, 20 A. 1031 (1885).

In the instant case we have decided on other than constitutional grounds that the challenged statements were inadmissible. Therefore, it is not necessary that we decide the constitutional question, and we do not do so.

THAT PART OF THE JUDGMENTS OF THE COURT OF SPECIAL APPEALS WHICH AFFIRMED THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY DENYING THE MOTION TO ENFORCE THE PLEA BARGAIN AGREEMENT AFFIRMED;

THAT PART OF THE JUDGMENTS OF THE COURT OF SPECIAL APPEALS WHICH AFFIRMED THE JUDGMENT ENTERED BY THE CIRCUIT COURT FOR BALTIMORE CITY UPON THE CONVICTION OF FELONY MURDER REVERSED;

THAT PART OF THE JUDGMENTS OF THE COURT OF SPECIAL APPEALS WHICH AFFIRMED THE CONVICTION OF ROBBERY WITH A DEADLY WEAPON REVERSED;

CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AS TO FELONY MURDER AND ROBBERY WITH A DEADLY WEAPON AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL;

COSTS TO BE PAID ONE–HALF BY PETITIONER AND ONE–HALF BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.

COLE, J., concurs in the result for the reasons stated in his dissenting opinion in *Wright v. State,* 307 Md. 552, 588, 515 A.2d 1157 (1986).