765 A.2d 97

**Eugene Edward WINDER**

v.

**STATE of Maryland.**

**No. 51, Sept. Term, 1999.**

Court of Appeals of Maryland.

Jan. 9, 2001.

278

Nancy S. Forster, Asst. Public Defender (Stephen E. Harris, Public Defender, and Julia Doyle Bernhardt, Asst. Public Defender, on brief), Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Md., on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL, and HARRELL JJ.

HARRELL, Judge.

On 19 February 1998, firefighters discovered the bodies of John Mainor, Geraldine Mainor (his wife), and Christine Lee Mainor (the couple's granddaughter), after extinguishing a fire in their home in Fruitland, Wicomico County, Maryland. Maryland State police officers arrested Eugene Edward Winder, Appellant, on 24 February 1998, on account of the Mainors' deaths. He was charged with three counts of first-degree murder, two counts of first-degree burglary,[1] and a single count of arson. Upon Appellant's request for removal, his case was transferred from the Circuit Court for Wicomico County to the Circuit Court for Baltimore County. Appellant's trial proceeded on 17 May 1999, as a bench trial, on a not guilty plea with an agreed statement of facts. The trial judge ultimately found Appellant guilty of all charges. Appellant requested to be sentenced by a jury as to the murder convictions. *See* Maryland Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.), Article 27, § 413(a) & (b). The jury sentenced him to death on each of the murder counts. The trial judge sentenced Appellant to twenty years imprisonment for the first-degree burglary conviction, and a consecutive term of

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. During trial, the State *nolle prossed* one of the first degree burglary counts.

thirty years for the arson conviction. This case is before this Court on automatic appeal pursuant to Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 414[2] and Maryland Rule 8–306(c).[3]

## ISSUES

In this appeal, Appellant presents the following six issues for our consideration:

I. Did the lower court err in denying Appellant's motion to suppress?

II. Did the lower court err in refusing to grant a mistrial after engaging in an *ex parte* communication with the jury?

III. Did the lower court err in refusing to redact that portion of the presentence investigation report stating that Appellant "does not have any psychological or emotional problems?"

IV. Is the evidence sufficient to convict Appellant of first-degree burglary?

V. Did the lower court err in restricting, at sentencing, the defense presentation of relevant evidence?

VI. Did the lower court err in refusing to propound Appellant's requested voir dire question?

Because we shall reverse the judgments based on our analysis of Issue I, we need address additionally only Appellant's issue IV. Notwithstanding that, we choose to comment briefly on issue II as well.

**2.** Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 414(a) provides:
(a) *Review by the Court of Appeals required.*—Whenever the death penalty is imposed, and the judgment becomes final, the Court of Appeals shall review the sentence on the record.

**3.** Maryland Rule 8–306(c) provides, in pertinent part:
(c) Whenever a sentence of death is imposed, there shall be an automatic appeal to the Court of Appeals on both the determination of guilt and the sentence, whether or not the determination of guilt was based on a plea of guilty.

## BACKGROUND

Around 4:15 a.m. on 19 February 1998, Mr. and Mrs. Emery Revelle were driving through Wicomico County en route to Florida. As they drove past 501 North Division Street (the Mainors' home) in Fruitland, the Revelles noticed heavy smoke rising from the house. The Revelles reported the fire to the authorities. The fire department arrived at 4:31 a.m. After the fire was extinguished, firefighters discovered the bodies of Geraldine Mainor (age 70), Christine Lee Mainor (age 20), and John Mainor (age 71) in the family room of the house.[4]

Later that morning, at approximately 7:00 a.m., Allan Mainor, the son of Geraldine and John Mainor, observed Appellant at the fire scene. He noticed that Appellant had a bandage on his hand and a cut on his nose. Appellant spoke briefly with Sergeant Matthew Brown of the Fruitland police department. He identified himself as the boyfriend and fiancé of Christine Mainor.

The following day, Sergeant Brown telephoned Appellant and requested that he come to the police station. Appellant voluntarily complied and met there with the police at 6:00 p.m. While at the station, Winder agreed to have a cut on his hand photographed and gave the police clippings from his fingernails. With Appellant's consent, the police also searched his vehicle, finding blood spots on its interior. The police kept the vehicle for testing. Additionally, Appellant voluntarily turned over the clothing that he wore the morning of the fire. After a three-hour interview with Lieutenant George Truit, Appellant left the police station at 11:00 p.m.

---

4. Forensic investigations concluded that the victims were dead before the fire was started. Dr. James Locke, the state medical examiner who performed the victims' autopsies, testified at the sentencing phase of Appellant's trial that the deaths were caused by blunt force blows to the victims' heads, necks, and upper bodies. Dr. Locke explained that the injuries were probably inflicted by an ax or hatchet and a knife. The Fire Marshall's office determined that the fire was intentionally set and was started in the room where the victims' bodies were found.

After Appellant left the police station, the Fruitland police chief called in the Maryland State Police to assume control of the investigation. After executing search warrants for Appellant's home, on the evening of 23 February 1998, Sergeant Kim Collins (Collins) and Corporal Robert McQueeney (McQueeney) of the Maryland State Police requested that Appellant accompany them to their Salisbury Barrack. Appellant consented to the officers' request.

Appellant arrived at the state police barracks at approximately 10:00 p.m. on 23 February 1998. The interrogation that followed spanned a twelve-hour period. At least four members of the State Police participated in the questioning. Near the end of the interrogation, at approximately 6:00 a.m. on 24 February 1998, Appellant confessed to murdering the Mainors and setting fire to their home.

In the initial stage of the interrogation, Appellant was placed in a conference room with Collins, McQueeney, Sergeant Leone Fisher (Fisher), and Sergeant William Benton (Benton). The officers told Appellant that he was not under arrest and that he was free to go at any time. The officers offered Appellant a drink and advised him of his *Miranda* rights.[5] Appellant signed a form waiving his *Miranda* rights and agreed to have the interrogation audio tape recorded.[6] The interrogation began at approximately 10:35 p.m.

Sergeants Fisher and Benton handled the questioning in the beginning. Appellant initially answered basic background questions regarding his job, education level, and his relationship with Christine. In response to a question inquiring when he last saw Christine alive, Appellant stated that he met with her at 6:30 p.m. on 19 February 1998. The officers also asked Appellant to explain the nature of his relationship with the

---

**5.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**6.** Appellant did not request an attorney to be present at any time during the interrogation.

grandparents. Commenting on Appellant's answers, Sergeant Benton interjected: [7]

> [w]e need you to be honest with us man so we can understand what's going on inside of you. Right now, your sitting there shaking to death, we see it. I'm going to tell you something. There is a lot bothering you and we know you want to talk. That's why we're here to talk to you tonight, okay. The only way we can help you and get things off your chest is for you to talk to us and open up to us ...

Throughout the early stages of the interrogation, Sergeant Benton repeatedly asked Appellant to tell him about the murders, but Appellant stated that he knew nothing about the crimes and denied any involvement. After the Officers shared with Appellant their personal theories why he committed the murders, the following exchange occurred:

> Benton: ... let me ask you a question. What did you think would happen if you told us the truth about that night? Let me ask you that.
>
> Winder: I'd go to jail.

> \* \* \* \* \*

> Benton: Eugene, can I say something to you. You just admitted to us that you killed them. Do you know why? I asked you. I said Eugene, what do you think what happened if you told us the truth. You said I'd go to jail. So, you just told us you killed them.
>
> Winder: No, I didn't kill them.

---

**7.** Unless otherwise indicated, the excerpts are taken from a transcribed tape recording of Appellant's interrogation beginning the night of 23 February 1998 and continuing until the morning of 24 February of 1998. At times during the interrogation, gaps occurred in the recording and, accordingly, in the transcript. At a hearing before the Circuit Court, the officers testified that the tape recorder occasionally turned itself off or ran out of tape when the officers were not paying attention to it. In addition, many of the tapes were taped over mistakenly.

To portray accurately the tenor of the interrogation, we have made scant effort to edit the selected transcript excerpts of the interrogation, although we have not included portions that are irrelevant to the appellate argument or are non-materially redundant.

■■■■■■■

Benton: Eugene, you just admitted it. We'll play the tape. I said Eugene what do you think what happened if you told us the truth. You said I would go to jail. I said okay. So, you think you would go to jail if you told us the truth. You said yeah, that's exactly what you said. Why don't you tell us what happened? Christy and her grandparents are [sic] deserve to know the truth about what happened. Nobody is going to think you are an animal. What we want to know is why this happened. It is a crime of passion, but we need to know from you, did she come at you with a weapon while you were in that house?

Winder: I wasn't there.

Sergeant Benton, professing to believe that he had secured a confession, continued to bring up that he thought Appellant had admitted to committing the murders. After Sergeant Fisher left the room, the following occurred:

Benton: She's gone, let's talk man to man. Let's be honest. You admitted to me a little while ago. You told me that if you told me the truth you would go to jail. People have committed a crime and they haven't gone to jail especially for the rest of their life. Let's just sit here and think. If there comes a time when you have to stand trial for this case, how do you think the people in the community are going to react if you continue to fight it, to fight it, to fight it, to say you never did it, and the state presents evidence to the contrary. How do you think that's going to look?

Winder: Not good.

* * * * *

Benton: Eugene, you've admitted to us that you did it, right here on this tape. I said Eugene what would happened if you told us the truth, and you said I'd go to jail. I said so if you told us the truth of what happened that night you would go to jail and you said yes I would. Eugene, your there. Think of how much better your going to feel once you get if off. You need to be honest with us. Think of the community. The community is [in] an uproar. They think they've

got a person out there whose killed these people and set their house on fire. They have no idea who it is. You think we're the only ones right now that are looking for you. Why do you think we wanted so much to look for you tonight?

Winder: I don't know.

After informing Appellant that the police found blood-stained clothing in his residence, Sergeant Benton informed Appellant that:

We're not interested in sending you to jail for the rest of your life, Eugene we told you that. We think the person who committed these needs help. I think you need help. The only way we can get you that help is for you to let us know what happened. We can let the State's Attorney's Office know hey, Eugene's told us what happened, but I think Eugene needs some help. The only way we can do that is for you to explain to us why. There is a rage inside of you that you can't control. It's fine, it's a rage. There is no other way to explain it. We're sitting here talking to you, a mild-mannered person. I guarantee you Christie can push your button and piss you off in a heart beat, that's what happened that night. I need you to tell me what happened.

Questioning continued in this vein:

Benton: We can let the State's Attorneys Office know that you need help. We're not stupid people, your not a stupid person, that's why we're trying to talk to you this way. We just want to know why. I want to give everybody a chance to tell me why things happen and the reason for that is if it does get to trial later down the road which is something we're all going to have to look at. I'm not going to lie to you there. At least then people they understand why. We're asking ... if nothings is ever said, no one ever knows because no one else was there. Nobody is going to understand what happened. It is your chance to tell us. Eugene, you want to talk to us. I see it all over your face. Why don't you tell us what happened?

Winder: I don't know.

At this point, approximately 11:30 p.m., the officers took a break of mere seconds to change the tape. When the questioning resumed, the officers inquired as to what Appellant believed should happen to the person who committed the crimes and what he thought motivated the person to kill the victims. As Appellant responded, Sergeant Benton commented that he saw Appellant's heart beating through his shirt and that it was a sign he was lying.

Detective Sergeant Frank Ford of the Maryland State Police entered the conference room shortly after the 11:30 p.m. break. He apologized for his late arrival and told Appellant that they would have to start from the beginning and review all the questions asked and answered up to this point in the interrogation. As Sergeant Ford began the review, he told Appellant:

I know the police in Fruitland talked to you last week and they didn't treat you very well. I'm sorry, because right now son, you're a victim. When I call you son, I don't mean it degrading, but you kind of remind me of my son. I'm forty, you're younger than me ... I'm hurting man, and I chose to do this, to get involved in this because of me knowing the family like that and talking to them because they're hurting too. I'm sorry about what happened with the Fruitland Police. I don't work that way. I've been around ... I'll give you some background about myself. You don't know me from Adam. I've been doing this for almost twenty years. I've worked all over the state. I've worked in Baltimore. I have been involved with a lot of young black men,[8] pro and con and you know what. I can go to my grave man saying that I've saved a lot of brothers. I worked in Baltimore City Homicide for almost a year and I saved some brothers man. I've saved a lot of them. To me there ain't nobody bad. It ain't nobody good. Everybody's human you see what I'm saying and we all do make

---

8. Appellant is an African American who was born on 24 March 1974.

mistakes man. If you make a little mistake, in your life, no body gives a shit. The big mistake in your life, they think oh my god. Now wait a minute, what's the difference between a big mistake and a little mistake? ...

Sergeant Ford later took a break at 12:06 a.m. and gave Appellant a soda.

The questioning apparently resumed at 1:27 a.m.[9] Sergeant Fisher talked to Appellant more about his relationship with Christine and the future they planned together. Sergeant Fisher then stated:

Eugene, help me bring them home. I can make you a promise, okay? I can help you. I could help you, I could try to protect you. I can be your friend. I'm not the enemy.[10]

She later added:

Close your eyes again. Think about it, Eugene. Think about everything that's happened. Think about every little thing that's happened lately. It hurts, Eugene. It really hurts. And you're hurting just like that family was hurting today when they were sobbing and they were all holding on to each other. You know, I never saw Frank Ford cry before today. I thought it was just Corporal Benton,[11] my partner, and me. We cry all the time with families, Eugene. I want to cry with you now. But you've got to cry, Eugene. You've come so close this night in crying.

Sergeant Benton repeated numerous questions to Appellant regarding the clothing that the police had taken from Appel-

**9.** It is unclear from the transcript of the interrogation whether Appellant's break lasted until 1:27 a.m. or whether the tape recorder was not turned on until 1:27 a.m.

**10.** The statement "help me bring them home" may have been part of the officers' evocative efforts to get Appellant to agree to identify the bodies of the victims so that they could be moved from Baltimore City to Fruitland for burial.

**11.** Apparently, Sergeant Benton was promoted from the rank of corporal to sergeant after the interrogation and before the proceedings in the Circuit Court.

lant's residence and why Appellant was lying to the officers about his involvement in the murders. Appellant continued to deny that he was involved or that he was lying. Sergeant Benton and Appellant then had the following exchange:

Benton: When we initially talked about it, you said you didn't want to tell me because you'd go to jail. Okay, let's get that out of the way. We talked about that and that's why I left, shortly after that. Okay? I asked you why you didn't want to tell me the truth about what happened. You said because I don't want to go to jail. I said, so you don't want to tell me the truth because you don't want to go to jail. You said right. I can mention to the State's Attorney, I can tell him. I'll call him right now and tell him, hey, Eugene will tell me everything that's going on but Eugene want some help too. Could Eugene just went into a rage. He don't know what he did.

Winder: I didn't do it.

Sergeant Benton and Fisher resumed theorizing with Appellant about the crimes. They asked about Mr. Mainor and whether Appellant thought he was the first of the victims to be killed and other hypothetically framed questions about potential motives for the crime. Sergeant Fisher then switched gears and began telling Appellant about Sergeant Ford's vast experience with the legal system. She explained:

(Inaudible) and you know how Frank is. Frank told me before how you helped them. And, you know, Eugene, we work with Frank. All right? But we don't have the years of experience. And we also don't have the knowledge that Frank has about how to work the court system and how to work everything out through judges. When Frank Ford goes into a courtroom, the judges listen to him. The judge in your case will listen to him. Your trial that you're doing right now. They'll listen. You've got Frank Ford and he's doing all that stuff, and he's sitting here offering to help you and offering to talk to you. Frank's been there. And I hope that when I have the years on the job like he does—I mean, we're good. We work and we're good. But Frank Ford (inaudible). He's the man. And he's talking to the

family right now. Have you ever seen Frank cry? I saw him cry today. I saw him cry today.

A period of approximately two hours then passed during which the officers implored Appellant to stop lying to them and questioned him on matters not relevant to this appeal. At 2:41 a.m. the tape was changed. In one of the many long monologues by Sergeant Ford that followed during the renewed interrogation, he stated:

Goddarn you got to love this girl. I'm telling you, you got to love this girl. People are thinking now that you don't love her and the war just goes on like this. Their going to just bolster her up. He didn't love her. You do the right thing. You say you love her and then we'll help you. We will help you inside and we will help you if you would like us too. You got a better chance in life. You got a better chance at freedom. That's why they call it an accident. She ain't never going to leave, you know what I mean? ...

Sergeant Ford further begged Appellant to identify the bodies, asserting:

Look, listen, listen, and listen to me, okay. I can't bring Christy back for a viewing under this man made law until I can positively absolutely say that it's Christy. The only way I can do that is to prove this by dental records. She has no dental records. The only other way I can do this by having the person who last saw her in that house say that was Christy. Do you follow me? Right now, don't have to deal with the rest of this stuff. You got to tell me man, okay, yes, I was there that's Christy. I can bring her back. I can bring her back then, do you follow me? I can get her back. The rest of this stuff, whatever else happens, we don't even have to go into. I'm talking about Christy, alright, but late that night, I got to know that she was there. Do you follow me? I know she was there. Everybody knows she was there, but these legal papers, you've been through the legal system with filing bankruptcy you've got to have amount of proof and this and that and all this kind of stuff. Why do you think she ain't back man? You know

what I mean. I can't get her back. I just want to put her to rest. Her soul will not be at rest. Her heart is divided, she's up there and she's thinking ... she's on hand there's you and one hand there's the family and nobody isn't at peace. You walking on the wrong device being threatened, you don't know what your doing, what your saying, your confused. Your holding everything inside. We've got to put her to rest. You have to. If you don't this is no good, this don't mean nothing. You can't say to your partner, who's that, that's my girlfriend Christy, we were very much in love. If he asks what happened, you can't say where she died and where she's buried, but she's always in my heart. You can't say that, cause she ain't going to be. I can't get her back, I can't even get her buried for. They going to end up burying a memory, a nothing.

Sergeant Ford then changed his tack. He informed Appellant about alleged rumors of revenge that had been "heard" in the victims' neighborhood in Fruitland, Maryland.[12] Sergeant Ford explained:

A rumor was also spread that we can't rest her. They can't even identify her. They already know who she is but they won't really release her until they got positive ...

Sergeant Ford later continued:

That don't mean nothing. Hell, even bad ones don't mean anything. You know, she's lost. But, we can't even get her body. People, believe it or not, are understandable. People have a soft spot in their heart. We are the image of our maker. It's like you go to a store. You're a kid and you steal a piece of candy. And the guy catches you. You say, I didn't take that candy. Okay, no problem. I deal with you. Or you get the piece of candy, the guy catches you and you say, sorry mister, I was hungry. Can I just pay

---

12. At a hearing before the Circuit Court, Officer Ford stated:

the Mainors were teachers in the Salisbury area for years. Everybody in the community, whether in jail or out of jail, they loved the Mainors. Everybody knew that. And we received information, the word on the street was some people might want to get Eugene ...

you back? And (inaudible) and he says, man, don't do it again. Get out of here. He turns his back and he goes to his wife or whoever and he says, you know what, at least the kid admitted to it and said he was sorry. I've got respect for him. He made a mistake but he admitted to it. I'll give him respect for that. But when you lie, cheat, deny, debate, hey, that's okay. That's when things go the hard way ...

Throughout this part of the interrogation, the officers abandoned all pretense of questioning. Instead, Sergeant Ford made long pleas about the need to return Christine to her home and told Appellant that he will feel better and be safer once he confesses to the crimes. He explained:

In this situation, that's your only way of help. You've got no more help. That's it. This is your only way of help. This coming clean and getting this child back here. I call all young ladies child. You know how girls call girls child. I don't mean anything by it. That's her. You know, the people that you know, that you guys knew together, all the people at school. All of that's changed. All of that's changed. You can leave Salisbury after all of this. Start your life someplace else. Which you might have to. I'm not going to lie to you about that. But you ain't going to never have that until you let her rest ...

Sergeant Ford also purported to clarify his role in the investigation of the murders.

Because when you get closure, you can sit back and says it's over. It's kind of like, you know, something's on your mind from long ago and it finally gets out and the problem just (inaudible) and you feel a whole hell of a lot better. And most of the time, things work out. Ain't no different. Ain't no different. This is my job. This is what I do. This is what I'm supposed to do. I am not supposed to put people in jail. I'm supposed to prevent things from happening. I'm supposed to help people. That is my function. You follow me? That's my function, Eugene ...

\* \* \* \* \*

That's right. Man, we've got to get her peace. I've got to save you, mentally, and I've got to save you physically. And this family can help you physically. You see what I'm saying? You follow what I'm saying to you? *Because I know that there are people in that family and not the immediate family who are ready to come out here and do some bad things to you. You follow me? And I can't be there all the time.* I know, but this closure, oh, yes, this closure is going to help you. Eugene, they knew all the time. But they were like you. They didn't want to face it. They knew. It didn't take a brain surgeon to figure it out. Ain't that hard to do. This shit happens all the time....

(Emphasis supplied).

At this point there is a gap in the transcript of the interrogation. It is unclear what time the tape was shut off. In testimony given at one of the suppression hearings before the Circuit Court, Sergeant Ford filled in the relevant occurrences during this gap in taping. At approximately 6:00 a.m., Sergeant Ford told Appellant "you might as well go ahead and leave, Eugene, if you are not telling the truth." Appellant began to leave and Sergeant Ford stated "well, you can't go; we have a search warrant for you." Appellant answered "either way I'm dead" and "if I told you, I will go to jail and I'm dead. If I don't tell you, I'm dead." Sergeant Fisher, in her testimony at the court hearing, stated that, at 6:00 a.m., she informed Appellant that they had a search warrant for Appellant's body and that she asked him "what was it going to show?" Fisher explained that Appellant answered, "it is me." Following this exchange, Sergeant Ford testified that, at 6:20 a.m., Appellant told Sergeant Fisher that he wanted to identify the victims.

After the officers again advised Appellant of his *Miranda* rights, he identified the victims from autopsy photographs, and then confessed to Sergeant Fisher that he murdered the

victims.[13] The confession lasted until approximately 8:00 a.m. when Appellant was given time to take a nap. He slept from 8:20 a.m. until 9:30 a.m. When Appellant awoke, he was given a soda and a "tasty cake." The interrogation resumed and Appellant gave more details about the murders. At 10:27 a.m., the officers informed Appellant that he was under arrest and told him that he probably would be charged with murder, arson, and assault. At 10:30 a.m., Appellant wrote a letter of apology to the family of the victims.

Charges of murder, arson, and burglary were filed in the Circuit Court for Wicomico County. On 9 October 1998, the case was transferred, on Appellant's removal suggestion, to the Circuit Court for Baltimore County. Pretrial motions hearings were held in the Circuit Court on February 11, 12, 16, and 17, March 24, and April 6, 21, and 22, 1999. Of relevance to this appeal, many of the pretrial hearings focused on Appellant's motion to suppress the statements made during his interrogation by the Maryland State Police and the letter of apology he wrote to the victims' family.[14] At these hearings, the police officers that were present during Appellant's interrogation and ultimate confession, including Sergeants Benton, Fisher, and Ford, testified on behalf of the State. Appellant did not testify. A large portion of the officers' testimony, particularly on cross-examination, consisted of the officers reading from the interrogation transcript. They also testified that at many points during the interrogation, Appellant was shaking, crying, and his heart was observed beating through his shirt.

After the suppression hearing on 17 February 1999, the trial judge explained "there is no violation of *Miranda* rights there at all. That is very easy for me to decide. They said, time and time and time again, ad nauseam, right out of the play

---

13. Apparently, due to a gap in the tape, a large portion of Appellant's confession was not recorded. The agreed statement of facts recited at the bench trial supplied those details.

14. Unless otherwise noted, any future reference to Appellant's confession, includes the letter of apology.

book, these are the *Miranda* rights. The question is threatening protection and intimidation." The trial judge continued, however:

> But here is what bothers me. . . . 'We need to protect you. I promise. We are not interested in sending you to jail for the rest of you life. Promise. People ready to come out here to do bad to you. Threat? I will not be able to help you. Intimidate. We can let the State's Attorney's know that Eugene needs help. The only way is to explain why.' Promise. . . . You walk. You can leave Salisbury after all of this and start over somewhere else. Now these things worry me.

Obviously troubled by the promissory and threatening aspects of the police statements during the interrogation, the trial judge stated that he was not prepared to rule further on the suppression motion and asked the parties to prepare memoranda addressing his concerns. On 22 April 1999, after considering further arguments from the parties, the trial judge denied the suppression motion and ruled that Appellant's confession would be admissible at his trial. He explained:

> In this case, considering all of the pluses and all of the minuses, I am going to deny the motion to suppress because I find the State has sustained its burden, its burden to convince me by [a] preponderance of the evidence that what has been produced does not show that nexus or catalyst or thread or causation, . . . running through. It is just not there. . . . It does not go over the line.

Appellant's trial began on 17 May 1999. The guilt phase proceeded on a not guilty plea with an agreed statement of facts.[15] We shall recite only those portions of the agreed statement of facts that may be relevant to the appellate issues we address:

---

**15.** At the start of trial, counsel for Appellant informed the Court that Appellant's choice to proceed on a agreed statement of facts was "[a]gainst the advice of counsel." Shortly before the statement of facts was read into the record, counsel for Appellant made a continuing objection based on the arguments raised in the suppression motions and hearings. The Court granted the requested continuing objection.

STATE'S ATTORNEY: Your Honor, the facts in this case would show that February 18th of 1998 was the 70th birthday of Mrs. Geraldine Mainor. The evidence would further show that during the course of the day and the evening, that she had received several telephone calls. The State would produce testimony that one of those calls was from her daughter, Karen Mainor Harris.

Also on that evening, her son Allan Mainor, his wife Kim and their two daughters arrived at the Mainor residence approximately 7 o'clock that evening to celebrate Ms. Mainor's birthday. Ms. Mainor was presented with a present. The individuals sat down and had cake and ice cream and reminisced about earlier times.

Allan and Kim Mainor left at approximately 8:15 to 8:30 on the evening of February 18th, 1998. To the best of their knowledge, Mr. and Mrs. Mainor were the only people who were still inside of the residence. Christie Mainor was not present at that time[.] . . .

\* \* \* \* \*

As Allan Mainor was leaving the residence, Mr. John Mainor did come with him to the door. Mr. Allan Mainor would testify that his father had always been a stickler, very particular about locking the doors, and that on this particular evening he has a specific recollection that John Mainor in fact locked the door to the residence of this particular house.

The next contact that anyone other than the murderer had with Mr. or Mrs. John Mainor was at approximately 9:30 or slightly afterwards when Connie Martin indicated she called her cousin Geraldine. . . .

\* \* \* \* \*

Dwight Dennis is an individual who is also known by the name of Marlow who had started a relationship with Christie Lee Mainor. Mr. Dennis spoke to Christie Lee Mainor by phone late in the afternoon on February 18th of 1998

when he called Christie Lee Mainor after school. At a later time Christie then contacted Dwight Dennis through his pager and they made arrangements to get together that night.

Christie Lee Mainor drove to a little market or convenience store called Sandy's One–Stop in Salisbury where she picked up Mr. Dwight Dennis. Together they went to the Dennis household where they watched a movie together on tape and conversed and at approximately 10 o'clock in the evening on the 18th, Christie Lee Mainor took Dwight Dennis to the sister's apartment in Salisbury, at a location called the Waterside apartments, and Christie dropped Mr. Dennis off at that location. Mr. Dennis did make a request that Christie Mainor page him when she got home, just to let him know that she was okay, but he never received any page.

At approximately 4:15 in the morning on Thursday, February 19th of 1998, a couple, Mr. Emery James Revelle and his wife, Sue Revelle, passed the Mainor house, Mrs. Revelle noticed that there was smoke billowing from outside the eaves of the house which was located to their left given the direction of travel. She told her husband and persuaded him to turn around and go back.

Mr. Revelle, upon his approach, saw that there was smoke emanating from the household and Mr. Revelle attempted to enter the household through the front door. Even though there was fire that was apparent at that time, he tried to open it. Unfortunately he found the front door to be locked . . .

Mr. Revelle realized he could not enter the residence at that location due to the flames, went off to some of the bedroom windows on the north part of the house. This house faces South—North Division Street in Fruitland and he went to the—what would be the left to the front of the house, which was the north part of the house. He broke out some windows and he was yelling in hopes of waking somebody because he also noticed and Mrs. Revelle also noticed that there were cars still located in close proximity

to the house. With no success he then broke in the sliding glass door. He was met with heavy smoke and was not able to enter.

It is interesting to note that to this time neither he nor Mrs. Revelle heard any type of smoke alarm from inside the residence. Mrs. Revelle did call 911, or emergency communications, which received the call at approximately 4:22 in the morning. Mrs. Revelle had attempted to locate the side garage door, which was closed but apparently unlocked at the time, although she could not gain entry to the main portion of the house also due to fire and smoke.

\* \* \* \* \*

Your Honor, the Defendant, as I indicated, had a relationship with Christie Lee Mainor prior to February 18th, of 1998. He was well-known to all family members, including John and Geraldine Mainor, as well as Allan, Kim and Karen Mainor. He had been at this residence at 501 North Division Street on a number of occasions prior to February 18th. He was aware that entry is normally gained to the household by family members and others by a door leading from the outside into the garage and then from another door leading from the garage into the house.

\* \* \* \* \*

The Fruitland officers received some initial information from the Defendant that he last saw Christie at 6:20 when they had spoken in the garage; that he tried to call her two times after that, speaking once with Mrs. Mainor, being told that Christie was in the shower. The second time occurred when Kim and Allan Mainor were over at the residence for the birthday celebration. Kim Mainor spoke to the Defendant at that time and told the Defendant that Christie was in fact not home.

\* \* \* \* \*

At that point [in the police interrogation at approximately 6:20 a.m. on 24 February 1998] Sergeant Ford and Sergeant

Fisher left the room. Corporal Robert McQueeney of the State police entered the room to sit with him and Corporal McQueeney advised the Defendant of his Miranda warnings on that occasion.

Sergeant Fisher soon returned and asked the Defendant what the evidence would show, referring to the search warrant and their drawing of his blood. The Defendant replied, and I quote, "it is me."

A comment was made to him about whether it was murder or it was a crime of passion and that the penalties could be different. The Defendant said "one was passion and the other two were murder."

The Defendant soon began to describe what occurred, although he had difficulty remembering, according to a statement to the police, his specific acts on that evening. He acknowledged to the Maryland State troopers that he parked his Jeep at the parking lot of an apartment complex over one thousand feet away from the Mainor residence of 501 North Division Street in Fruitland, that he walked to the Mainor residence.

At that point he observed Christie Lee Mainor walk into the side garage door. The Defendant admitted that he walked up behind her and she screamed. The Defendant then said that he and Christie, Christie Mainor, were in the garage and that Mr. John Mainor came out of the kitchen with a knife. The Defendant said Mr. Mainor told Christie to get inside the residence, that John Mainor pushed the Defendant and, according to the statement of the Defendant, a struggle then ensued over the knife at which time the Defendant indicated he was cut. The Defendant said that he got the knife away from Mr. Mainor and then cut Mr. Mainor on the neck.

The Defendant said Mr. Mainor then located a hammer and struck the Defendant on his leg. The Defendant said that he got the hammer away from Mr. Mainor and the Defendant then told the troopers that he told Mr. Mainor to get into the house.

According to the Defendant's statement, Mr. Mainor went into the house and began knocking things off of the counter. I would note that Dr. Locke indicated that the injury to the skull of Mr. John Mainor would initially cause a loss of equilibrium and difficulty with balance.

Going on with the Defendant's statement, he indicated that all three victims were screaming and yelling and that while he was holding the knife he told them to all sit down and shut up. The Defendant stated to the troopers that at that point the Mainors were on the couch, meaning John and Geraldine Mainor were on the couch, but that he did not know where Christie was.

The Defendant stated that he recalls someone running through the house, struck him with a chair, and that it may have been Christie. The Defendant further indicated that at some point he blanked out, that he did not know exactly what occurred, but that he said after whatever occurred, they were all dead. He further indicated that he sat on the floor and that he knew they were dead because they were not screaming or moving.

He indicated he went to the truck, which was parked approximately a thousand feet away, that he sat there for a period of time. Then he went home and, later on, on the morning of February 19th, that he went to the hospital where he received stitches for the cutting wound to his hand.

* * * * *

The troopers were trying to elicit some more details from the Defendant about what had occurred. During this period of the interview the Defendant acknowledged that he was angry at Christie Lee Mainor and also at Geraldine Mainor. He indicated that he may have cut Geraldine Mainor with a knife. That he may have used the hammer to strike one of the victims.

\* \* \* \* \*

If I can have one moment, Your Honor. Your Honor, on the 25th of February of 1998, during an extended search of the area, including the field, a field which is located across from the Mainor residence at 501 North Division Street in Fruitland, an ax was located by a Deputy State Fire Marshall and was seized by Corporal Bruce Danna of the Maryland State Police. This ax was found in a field across from the Mainors' in a ditch, in fact.

Also during a search of the area, car keys are found across the street from the Mainor residence as well in a storm drain. I would indicate that the key fob or key ring is unusual and Karen Mainor would identify that as in fact being the car keys belonging to Christie Lee Mainor. Also, the keys, the key ring also contained a key which fit the Mainor residence as well, to be used to gain entry to the residence.

Batteries were also found in front of the house by firemen and also by fire marshals. These batteries were of a similar type which would have fit or could have fit into the smoke detectors which were located in the Mainor residence.

I would note that there were three detectors located inside of the Mainor residence. After a search was done after the fire, none of those smoke detectors contained batteries whatsoever.

Your Honor, the ax that I have described that was—there was a full-blown search done of the residence as well as the garage. There was no ax that was located in the garage area. Allan Mainor would have testified that his father in fact had an ax that had been handed down from his grandfather and that, based on his experience, it had in fact been kept in the garage area.

Furthermore, I would note that during the search Christie Lee Mainor's pocketbook and wallet were in fact found on the floor of the garage of the Mainor residence.

\* \* \* \* \*

The judge found the defendant guilty of three counts of first-degree murder and one count of arson, but reserved ruling on the burglary count. On 24 May 1999, the trial court found Appellant guilty of one count of first-degree burglary. The trial judge ultimately imposed a thirty year sentence for the arson count and a twenty year sentence for the burglary count.

Appellant elected to be sentenced by a jury on the murder convictions. The jury heard evidence for five days between 19 May 1999 and 26 May 1999. On 26 May 1996, following the conclusion of evidence, a discussion with counsel regarding possible jury instructions, and a short recess, the trial judge informed the parties that he had had a discussion with the jury out of the presence of the parties and counsel during the recess. He advised:

THE COURT: I went back and talked to the jury. Here is what I told them. I told them we were going to give instructions and let the State make its opening and then we are going to go to lunch. Then we will come back and do the Defendant's argument and then any rebuttal.

I told them also at that particular point I was going to give them the right to make the decision as to whether or not they want to deliberate tonight or whether they want to go home and come back tomorrow, but that would be their decision.

They then asked me some questions. Here are the total questions they asked. First of all, when are the alternates going to be released? I said, if the jury—as soon as the jury starts deliberating. The next question that they asked was about food and things and I told them that I can buy them dinner and sodas, things like that. Someone then asked me what we prefer? I said, well, if you are not too tired, I would like to see you deliberate a little tonight, but this is a decision that you can't make until 3:30 or 4 when we finish and you see how you feel about it. Once I tell you

to make the decision, you may talk about the facts of the case to determine whether you will make that decision.

The next question somebody asked is can the alternates stay in the courtroom afterwards? I said, yes. Somebody asked, can we talk to the attorneys? I said, yes, if you feel that you want to, you can. If you feel uncomfortable, then say no. Somebody said, well, what about if the press comes after us, wants us to talk? I said if you want to talk to them, fine. If you don't, it is whatever you feel.

And that is the long and the short of my conversation with the jury.

Counsel for Appellant requested that any future discussions with the jury be done on the record and while all the parties were present in the court room. A few moments later counsel made a motion for a mistrial based on the trial court's off-the-record discussion with the jury. The judge denied the motion, stating:

I'm certainly not going to grant a mistrial. The rule is that I not talk to the jury about things pertaining to the facts of the case and I didn't. You certainly can feel free to ask them any questions that you want. I most respectfully don't feel the Court of Appeals is that foolish. Motion denied.

The jury deliberated for approximately seven hours on 27 May 1999 and returned sentences of death for each count of first-degree murder. Meriting the sentence of death, the jury found that Appellant committed more than one offense of murder arising out of the same incident. *See* Maryland Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.), Article 27, § 413(d)(9).

## ANALYSIS

### I.

#### *Appellant's Interrogation Statements*

Custodial interrogations of suspected defendants have long been a traditional component of police law enforcement efforts. The United States Supreme Court has recognized:

the need for police questioning as a tool for effective enforcement of criminal laws cannot be doubted. Admissions

of guilt are more than merely desirable, they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.

*Moran v. Burbine*, 475 U.S. 412, 426, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410, 424 (1986) (citations and internal quotations omitted). We also have acknowledged the important role police interrogations serve.

A person who has committed an illegal act, however, is not always eager to admit his or her wrongdoing. Police officers, charged with investigating crimes and bringing perpetrators to justice, are permitted to use a certain amount of subterfuge, when questioning an individual about his or her suspected involvement in a crime.

*Ball v. State*, 347 Md. 156, 178, 699 A.2d 1170, 1180 (1997).

■ The conduct of an interview or interrogation of a suspect, however, has boundaries. While we permit the police to make appeals to the inner conscience of a suspect and use some amount of deception in an effort to obtain a suspect's confession, see *id*; *Kier v. State*, 213 Md. 556, 562, 132 A.2d 494, 498 (1957), when the police cross over the line and coerce confessions by using improper threats, promises, inducements, or psychological pressures, they risk loss of the fruits of their efforts. Confessions produced through such measures will be suppressed. *See Reynolds v. State*, 327 Md. 494, 505, 610 A.2d 782, 787 (1992); *Hoey v. State*, 311 Md. 473, 483, 536 A.2d 622, 627 (1988); *Hillard v. State*, 286 Md. 145, 151, 406 A.2d 415, 418–19 (1979).

■ We permit a criminal defendant's extrajudicial confession or inculpatory statement to be admitted at trial against him or her only if it is:

(1) voluntary under Maryland nonconstitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights,[16] and (3) elicited

---

**16.** Article 22 of the Declaration of Rights states:

in conformance with the mandates of *Miranda* [*v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)].

*Hoey*, 311 Md. at 480, 536 A.2d at 625; *Ball*, 347 Md. at 173–74, 699 A.2d at 1178; *Burch v. State*, 346 Md. 253, 265, 696 A.2d 443, 449 (1997); *Hof v. State*, 337 Md. 581, 598, 655 A.2d 370, 378 (1995). When the voluntariness of a confession is challenged properly, the State carries the burden of "showing affirmatively that the inculpatory statement was freely and voluntarily made and thus was the product of neither a promise nor a threat." *Hillard*, 286 Md. at 151, 406 A.2d at 418–19; *Hof*, 337 Md. at 605, 655 A.2d at 382. When a proper pretrial suppression motion is filed, the State must establish the voluntariness of the statement by a preponderance of the evidence. *See id.* At trial, if the issue of voluntariness is generated, the State's burden is to prove voluntariness beyond a reasonable doubt. *Id.*

Appellant argues that his confession was the product of improper threats and promises made by the police and therefore involuntary under the due process clause of the U.S. Constitution, Article 22 of Maryland's Declaration of Rights, and Maryland non-constitutional law.[17] As we shall explain, we agree with Appellant's assessment under Maryland non-constitutional law and hold that the trial judge erred in denying Appellant's suppression motion.[18]

---

That no man ought to be compelled to give evidence against himself in a criminal case.

**17.** Appellant does not challenge, and therefore we shall not address, whether the police acted in conformity with the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**18.** As a consequence of our holding, we need not consider Appellant's arguments made under our State and Federal constitutions. This Court has directed in the past that when a challenge is made to the voluntariness of a custodial confession,

it is usually preferable to determine initially whether the activity complained of comports with the requirements of this State's nonconstitutional law, and then, only if the court finds that it so complies, does it become necessary to reach the issue of whether any constitutional stricture prohibits the conduct in question ... because of the

In cases where we are called upon to determine whether a confession has been made voluntarily, we generally look at the totality of the circumstances affecting the interrogation and confession. *See Hof,* 337 Md. at 595, 655 A.2d at 377; *Gilliam v. State,* 320 Md. 637, 650, 579 A.2d 744, 750 (1990); *Reynolds,* 327 Md. at 504, 610 A.2d at 787; *Hoey,* 311 Md. at 483, 536 A.2d at 627.[19] We look to all of the elements of the interrogation to determine whether a suspect's confession was given to the police through the exercise of free will or was coerced through the use of improper means. On the nonexhaustive list of factors we consider are the length of the interrogation, the manner in which it was conducted, the number of police officers present throughout the interrogation, and the age, education and experience of the suspect. *See Hoey,* 311 Md. at 483, 536 A.2d at 627. Maryland law requires that "no confession or other significantly incriminating remark allegedly made by an accused be used as evidence against him, unless it first be shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary." *Hillard,* 286 Md. at 150, 406 A.2d at 418. *Hillard* articulates the proper analysis

well-settled principle 'that courts should not decide constitutional issues unnecessarily.'
*Hillard,* 286 Md. at 150, n. 1, 406 A.2d at 418, n. 1 (citing *State v. Raithel,* 285 Md. 478, 484, 404 A.2d 264, 267 (1979)).

**19.** Special considerations attend analysis of the admissibility of inculpatory statements made in the course of repudiated, rescinded, or breached plea bargain agreements. *See, e.g., Allgood v. State,* 309 Md. 58, 522 A.2d 917 (1987); *Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986). As general principles, the Court in *Allgood,* summarizing the teachings of *Wright,* stated:

1) When statements are obtained from a defendant upon promises made him by the State by way of a plea bargain agreement, the statements, in the light of Rule 4–243, are not inadmissible *per se,* under the inducement doctrine, in the State's case in chief at trial on the merits.
2) When the State rescinds, repudiates, or breaches the plea bargain agreement, for whatever reason, after the statements are so obtained, the statements, as a matter of law, are inadmissible *per se* in the State's case in chief at trial on the merits.

*Allgood,* 309 Md. at 78, 522 A.2d at 926–27.

where an accused alleges he was told that confessing would be to his advantage.

*Hillard* involved a defendant's challenge to convictions arising from the armed robbery of the residents of a home in Oxon Hill in Prince George's County. A week after the incident, the defendant was arrested and questioned for several hours in a Prince George's County police station. Following the interrogation, the defendant made a written confession. At a pretrial hearing, the defendant argued that the confession should be suppressed because it was induced by promises made by the police during the interrogation. The substance of the police officer's remarks to the defendant was:

> that if you are telling me the truth about your involvement in the occurrence, I will go to bat for you to the extent that I will tell the State's Attorney's office and the Court, number one, that you have cooperated, number two, you have told me the truth, and number three, I believe you were not knowledgeable as far as the murder was concerned.

*Hillard*, 286 Md. at 153, 406 A.2d at 420. Hillard further testified at the suppression hearing that the detective induced him into making the inculpatory remarks by promising that he would be "cut loose" if the statement he made was corroborated by any of the others involved in the crime. *Id.* at 148, 406 A.2d at 417. The trial court denied the motion to suppress the confession and the defendant was subsequently convicted. The Court of Special Appeals affirmed.

We reversed the conviction. At the onset of our analysis, we acknowledged that the question of whether a statement has been made voluntarily usually rests on the facts and circumstances of each particular case. *See Hillard*, 286 Md. at 151, 406 A.2d at 419. After examining over a century of Maryland precedent, we explained:

> if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declara-

tion will be considered to have been involuntarily made and therefore inadmissible.

*Hillard,* 286 Md. at 153, 406 A.2d at 420. Applying this analysis to the facts in *Hillard,* it was clear that the police offered the promise of intercession with the court and prosecutor in exchange for the defendant's confession. Because the State "did not meet or even attempt to fulfill its burden of demonstrating that the improper promises failed to induce Hillard's admissions, ... the statement in question here was involuntarily obtained, and therefore inadmissible at petitioner's trial." *Id.* at 153, 406 A.2d at 420; *see also Ball,* 347 Md. at 174–75, 699 A.2d at 1178; *Reynolds,* 327 Md. at 508, 610 A.2d at 789; S*tate v. Kidd,* 281 Md. 32, 35–36, 375 A.2d. 1105, 1108 (1977)("[f]or a statement to be the free and voluntary act of an accused, it must be obtained without force applied, coercion used, hope held out or promise made on the part of the authorities"); *Nicholson v. State,* 38 Md. 140, 153, 1873 WL 4274 (1873)("if the confession of the appellant had been induced by any threat of harm, or promise of worldly advantage held out to him by [the police], or by his authority, or in his presence and with his sanction, it ought to be excluded").

Based on *Hillard,* we glean a two-part test to determine the voluntariness of a custodial confession in circumstances where a defendant alleges that the police induced his or her confession by making improper promises. We will deem a confession to be involuntary, and therefore inadmissible, if 1) a police officer or an agent of the police force promises or implies to a suspect that he or she will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and 2) the suspect makes a confession in apparent reliance on the police officer's statement. As to the second prong, apparent reliance, we pointed out in *Reynolds v. State,* 327 Md. 494, 509, 610 A.2d 782, 789 (1992), citing *Ralph v. State,* 226 Md. 480, 174 A.2d 163 (1961), that

One common thread that runs through our cases is that the promise must have caused the suspect to confess. If a suspect did not rely on an interrogator's comments, obvious-

ly, the statement is admissible regardless of whether the interrogator had articulated an improper inducement. By definition, there would have been no "inducement" at all, because the interrogator "induced" nothing.

Both prongs must be satisfied before a confession is deemed to be involuntary.

■ The State shoulders the burden of establishing, by a preponderance of the evidence, that the suspect's confession or inculpatory statement was not made in reliance on a promise or inducement made by a police officer or agent of the police. *See Hof*, 337 Md. at 605, 655 A.2d at 382; *Hillard*, 286 Md. at 151, 406 A.2d at 418–19; *Kidd*, 281 Md. at 37, 375 A.2d at 1109; *Nicholson*, 38 Md. at 153, 1873 WL 4274 ("[t]he law is also well settled that the *onus* is upon the prosecutor, to show affirmatively, that the confession proposed to be offered was not made in consequence of an improper inducement").[20]

■ The trial court's determination regarding whether a confession was made voluntarily is a mixed question of law and fact. *See Baynor v. State*, 355 Md. 726, 729 n. 1, 736 A.2d 325, 326 n. 1 (1999); *Hof*, 337 Md. at 605, 655 A.2d at 382; *Hillard*, 286 Md. at 151, 406 A.2d at 419. As such, we undertake a *de novo* review of the trial judge's ultimate

───

**20.** As alluded to *supra*, the State's burden of proof, in the context of a pretrial suppression proceeding, is triggered by a defendant making a "proper objection," accomplished by filing a motion under Md. Rule 4–252(a)(4). *Hof*, 337 Md. at 606–07, 655 A.2d at 382. Winder filed a written motion in the present case. The State makes no argument that Winder's motion was not compliant with Md. Rule 4–252. Accordingly, although Winder did not testify at the suppression hearing, the filing of his proper motion to suppress triggered the State's burden of proof as to the components of the voluntariness analysis, and preserved for appellate review the trial court's pretrial ruling on the motion. See *Hof*, 337 Md. at 608–09, 655 A.2d at 382–83.

At the guilt phase of Winder's trial (a bench trial based on an agreed statement of facts and a not guilty plea), Winder's counsel asked for and received a continuing objection to the use of the confession based on the arguments made at the pretrial suppression hearing. We deem that to have preserved for appellate review the trial court's consideration of the agreed statement of facts, to the extent it included facts attributable to the confession alone.

determination on the issue of voluntariness. Our review of the Circuit Court's denial of Appellant's motion to suppress is limited to the record of the suppression hearing. *See Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519, 524 (2000).

■ In the first part of the *Hillard* test, the test is an objective one. We determine whether the police or a State agent made a threat, promise, or inducement. *Stokes v. State,* 289 Md. 155, 161, 423 A.2d 552, 555 (1980). In other words, a suspect's subjective belief that he or she will be advantaged in some way by confessing will not render the confession involuntary unless the belief was premised upon a statement or action made by an interrogating officer. *See id.* at 161–62, 423 A.2d at 555 (citing *Jones v. State,* 229 Md. 165, 172, 182 A.2d 784, 788 (1962)). *See also Fuget v. State,* 70 Md.App. 643, 652, 522 A.2d 1371, 1375 (1987)("we are unwilling to conclude that [the interrogating officer's] smile, coddling words, or sympathetic sounds coerced the appellant into making an incriminatory statement").

■ We also require a promise or offer within the substance of the officer's eliciting statement. Although a defendant need not point to an express *quid pro quo,* "[a] mere exhortation to tell the truth is not enough to make a statement involuntary." *Reynolds,* 327 Md. at 507, 610 A.2d at 788. For example, in *Ball,* we held that an interrogating officer's statement that the suspect would be "much better if [he] told the story" was not sufficient to render a suspect's inculpatory statement involuntary. *See Ball,* 347 Md. at 174, 176, 699 A.2d at 1178–79. To similar effect, in *Ralph v. State,* we concluded that an interrogating officer's statement that "it would be better if he told the truth" did not render a custodial confession involuntary. *See Ralph,* 226 Md. 480, 486–87, 174 A.2d 163, 166–67 (1961).

The second prong of the *Hillard* test triggers a causation analysis to determine whether there was a nexus between the promise or inducement and the accused's confession. In *Reynolds,* we made clear that "[i]f a suspect did not rely on an interrogator's comments, obviously, the statement is admissi-

ble regardless of whether the interrogator had articulated an improper inducement. By definition, there would have been no 'inducement' at all, because the interrogator 'induced' nothing." *Reynolds,* 327 Md. at 509, 610 A.2d at 789. *See also Johnson v. State,* 348 Md. 337, 350, 703 A.2d 1267, 1274 (1998).

 As to the second factor, the reliance, or nexus, between the inducement and the statement, to determine whether a suspect relied upon an offer of help from an interrogating authority in making a confession we examine the particular facts and circumstances surrounding the confession. One factor we consider is the amount of time elapsed between the inducement and confession. In *Ralph,* we held that a single, non-repeated statement, made eight hours before a suspect agreed to make a confession was too attenuated for us to conclude that the suspect had relied upon the statement in making his confession. *See Ralph,* 226 Md. at 486, 174 A.2d at 166. *See also Reynolds,* 327 Md. at 510, 610 A.2d at 789–90 (prosecutor's suggestion to seek counseling, occurring many days before the confession to a police officer, was not an inducement relied upon by the defendant). At the opposite end of the spectrum, in *Stokes,* we held that a defendant relied on a suggestion made by the police "that if he would produce the narcotics, his wife would not be arrested," because the defendant immediately thereafter revealed the location of the narcotics. *See Stokes,* 289 Md. at 157, 159–60, 423 A.2d at 553–55.

In addition to the temporal relation between the improper promises and a confession, we also have taken into account whether any factors, other than the interrogating officer's statements, may have caused the confession. In *Johnson v. State,* we held that sufficient attenuation circumstances existed between a police officer's improper inducing statements and a defendant's confession to render the confession voluntary. *See Johnson,* 348 Md. at 349, 703 A.2d at 1274. After the defendant in *Johnson* was taken into custody, his interrogators indicated that if he confessed to the crimes at issue, he may get medical treatment instead of getting "locked up for

the rest of [his] life and the key thrown down the sewer." *Johnson*, 348 Md. at 348, 703 A.2d at 1273. Three days later, the defendant requested to speak with a specific police officer who was not present when the inducements were offered to the defendant, and advised that officer that he wanted to make a confession. Shortly thereafter, the defendant made incriminating statements and wrote a partial confession.

On appeal, the defendant contended that his incriminating statements should have been suppressed because his statements were made in reliance on the improper inducements. We rejected that argument, holding that the confession was properly admitted at the defendant's trial. In reaching our conclusion, we took into account that the defendant initiated the meeting that led to his confession, made the confession three days after the inducements were offered to him, confessed to an officer who was not present when the improper inducements were offered, and confessed in a different building from where the inducements were made. Based on these intervening factors, we concluded that the defendant voluntarily confessed to his crimes. *See Johnson*, 348 Md. at 352, 703 A.2d at 1275. *See also Burch*, 346 Md. at 268, 696 A.2d at 450–51 (alleged prior beating by police officers occurring before the interrogation deemed not to have induced a later confession to a different police detective).

■■■ With this analytical framework in mind, we turn to the facts before us to analyze whether Appellant's confession was voluntary under *Hillard*. Beginning with the first prong of the test, we hold, without question, the police officers involved in the interrogation of Appellant made several promises and offers of help to Appellant attempting to elicit his confession. For purposes of presentation here and because the numerous inducing statements made during the interrogation fell into two distinct categories of promises to Appellant, we shall review the statements grouped according to the inducement extended.

The first group of promises offered to Appellant focused on providing him special consideration in the prosecution of his

case. Apparently the officers sought to convince Appellant that they were motivated, not by a desire to make him confess so he could be convicted, but rather with the benevolent purpose to find out information about how and why he murdered the victims so they could assist him with obtaining psychological assistance and leniency from the prosecuting authorities. At the initial stage of the interrogation, Sergeant Benton laid the foundation for this category by informing Appellant that the officers were:

> not interested in sending you to jail for the rest of your life, ... We think the person who committed these needs help. I think you need help. The only way we can get you that help is for you to let us know what happened. We can let the State's Attorney's Office know hey, Eugene's told us what happened, but I think Eugene needs some help. The only way we can do that is for you to explain to us why.

Shortly after this statement, Officer Benton reiterated, "[w]e can let the State's Attorney's Office know that you need help." Officer Benton then followed with a clear *quid pro quo* as he attempted to garner information about the crime. The officer stated, "I can mention to the State's Attorney, I can tell him. I'll call him right now and tell him, hey Eugene will tell me everything that's going on but Eugene wants some help too." Sergeant Fisher followed, shortly thereafter, with "I can make you a promise, okay? I can help you. I could help you, I could try to protect you. I can be your friend. I'm not the enemy."

The officers boasted that they had experience in helping people in Appellant's situation and that they had done so successfully in the past. Driving this point home, Sergeant Ford was introduced into the interrogation as a savior of young African American men involved with law enforcement authorities. When Sergeant Ford first met Appellant, he stated:

> I've been doing this for almost twenty years. I've worked all over the state. I've worked in Baltimore. I have been involved with a lot of young black men, pro and con and you know what. I can go to my grave man saying that I've

saved a lot of brothers. I worked in Baltimore City Homicide for almost a year and I saved some brothers man. I've saved a lot of them.

If any doubt existed regarding how or in what arena Sergeant Ford was going to assist Appellant, Sergeant Fisher cleared it up by stating:

you know how Frank is . . . . we don't have the years of experience. And we also don't have the knowledge that Frank has about how to work the court system and how to work everything out through the judges. When Frank Ford goes into a courtroom, the judges listen to him. The judge in your case will listen to him. Your trial that you're doing right now. They'll listen. You've got Frank Ford and he's doing all that stuff, and he's sitting here offering to help you and offering to talk to you. Frank's been there. And I hope that when I have the years on the job like he does—I mean, we're good. We work and we're good. But Frank Ford. He's the man.

Following this bold introduction, Sergeant Ford explained to Appellant how he was going to assist Appellant with his current problems. He closed with, "[t]his is what I'm supposed to do. I am not supposed to put people in jail. I'm supposed to prevent things from happening. I'm supposed to help people. This is my function, you follow me?"

The thrust of the interrogation tactics utilized by Sergeants Benton, Fisher, and Ford was that if Appellant confessed to the murders, the officers would help him. Specifically, they would contact the prosecuting authorities in order to provide him leniency during his subsequent prosecution. The officers purportedly would carry out their offers by advocating on Appellant's behalf to the state's attorney and the judge presiding over his anticipated trial.

Intertwined with these conspicuous offers to provide Appellant with assistance in his predicament was the second category of inducements offered in exchange for a confession. The officers explained to Appellant that the residents of Salisbury (Appellant's hometown and the county seat of Wicomico Coun-

ty in which Fruitland—the Mainors' town—also was located) were outraged by the murders and wanted to avenge the victims' deaths. At the suppression hearing, Sergeant Ford stated that the people of Salisbury loved John and Geraldine Mainor because they had been teachers in the area for many years. Based on this, the officers told Appellant that the friends of the victims were coming after him for revenge. The officers explained to him that if he identified the bodies and showed remorse for murdering the victims, essentially they could protect him from any vigilantes. If he continued to deny committing the murders, however, the officers implied that they could not guarantee Appellant's safety.

Sergeant Benton set the early tone for this aspect of the officers' strategy by stating, "[t]he community is in an uproar ... you think we're the only ones right now that are looking for you. Why do you think we wanted so much to look for you tonight?" Then, after Sergeant Ford was introduced, he began to preach to Appellant, lacing his sermons with phrases that could lead Appellant to believe that by confessing and showing remorse he would inspire the officers to protect him and possibly gain a chance at avoiding prison. Among his many inducing remarks, Sergeant Ford made the following declarations toward the end of the interrogation:

> People are thinking now that you don't love her [Christie] and the war just goes on like this. Their going to just bolster her up. He didn't love her. You do the right thing. You say you love her and then we'll help you. We will help you inside and we will help you if you would like us too. You got a better chance in life. You got a better chance at freedom. That's why they call it an accident.

Sergeant Ford later added:

> In this situation, that's your only way of help. You've got no more help. That's it. This is your only way of help. This coming clean and getting this child back here.... All of that's changed. You can leave Salisbury after all of this. Start your life someplace else. Which you might have to. I'm not going to lie to you about that.

Finally, before the final gap in the tape, he ~~finally~~ cautioned Appellant:

> I've got to save you, mentally, and I've got to save you physically. And this family can help you physically. You see what I'm saying? You follow what I'm saying to you? Because I know that there are people in that family and not the immediate family who are ready to come out here and do some bad things to you. You follow me? And I can't be there all the time.

Unquestionably, the second group of inducing remarks made it clear to Appellant that, in order to insure the officers' protection from the alleged angry mob of Salisbury residents, he needed to confess to murdering the Mainors.

In prior cases, we have held that the following statements constituted improper inducements: "produce the narcotics, [and your] wife would not be arrested" *Stokes,* 289 Md. at 157, 423 A.2d at 553; "if you are telling me the truth ... I will go to bat for you," *Hillard,* 286 Md. at 153, 406 A.2d at 420; "it would be better for [you] if [you] made a statement because if [you] did they would try to get him put on probation," *Streams v. State,* 238 Md. 278, 281, 208 A.2d 614, 615 (1965); "it will help you a lot," *Lubinski v. State,* 180 Md. 1, 4–5, 22 A.2d 455, 457–58 (1941); and "it would be better ... to tell the truth and have no more trouble about it," *Biscoe v. State,* 67 Md. 6, 6, 8 A. 571, 571 (1887). The common thread in each of these cases is that a singular statement communicated to the suspect may be sufficient to qualify as an inappropriate offer of help held out to the suspect.

In the present case, the interrogating officers' statements and conduct go far beyond that in any of our prior cases where improper inducements were recognized. During the twelve hour interrogation, the officers repeated many times that they would help Appellant. They offered him an apparent means to garner leniency from the state prosecutors and the trial court and protection from an angry mob. The only thing Appellant had to do in return for these meaningful

inducements was confess to a triple murder. The first prong of the *Hillard* test has been satisfied.

Turning to the second part of the *Hillard* analysis, our inquiry focuses on whether the State has shouldered its burden to prove that Appellant did not rely on the inducements held out to him by the interrogating officers in making his confession. *See Hillard*, 286 Md. at 153, 406 A.2d at 420. In its brief and again at oral argument, the State argued that the inducements made during the interrogation, in combination or each standing alone, were not the cause of Appellant's confession. To support its argument, the State suggests that Appellant's behavior and manner during the interrogation indicated that the statements communicated to him during the interrogation made no impression on him. The State characterizes Appellant as appearing "smug," "cold," and "hard" as he sat calmly and listened to the officers. Specifically, the State points out that at one point during a long soliloquy by Sergeant Ford, Appellant "apparently unfazed by Ford's words, simply asked to go to the bathroom." This, the State proposes, illustrates Appellant's mind was not focused on or receptive to the interrogation tactics, and therefore, the officers' statements had little, if any, impact on him.

The State further contends that Appellant's answers to certain interrogation questions were indicative of someone that was not swayed by a potential grant of leniency or offers of protection. The State highlights for us that when Sergeant Benton asked Appellant if he was "scared of going to jail," or "of what people would think," Appellant replied that he was not scared of anything.

We are not persuaded by the State's effort to convince us that the officers' statements were not the cause of Appellant's confession. In light of the suppression record in this case, we cannot comprehend how the State legitimately could characterize Appellant as a calm, collected individual during the interrogation. The record before the Circuit Court at the suppression hearings reveals that Appellant was intimidated by his surroundings and impressed by the matters communi-

cated to him by the officers. The officers themselves, in comments made during and after the interrogation, made it abundantly clear that Appellant was not "calm," "cool," or "smug." During the interrogation, Sergeant Benton claimed he could see Appellant's heart beating through his jacket. As Sergeant Fisher questioned Appellant, she noted, "[y]ou're shaking like a leaf. Can you feel that? You're shaking and you're cold. My God you're cold. [Sergeant Benton is] hot, I'm hot. You're freezing." At the suppression hearing, Sergeant Benton testified that "Appellant's "jaw was quivering" during the questioning and Sergeant Fisher later explained that Appellant "had a nervous twitch in his neck" and "his heart was beating rather fast." She also added that she had to get a cold towel for Appellant's head and that she was "afraid he was going to commit suicide." Taking into account the apparent physical manifestations of Appellant's fear, the fact that he was quiet during much of the interrogation and sometimes only gave terse answers to the officers' questions, is equally indicative that he was overwhelmed by the situation unfolding before him.

The timing of the confession vis à vis the statements of the officers does not support the State's thesis of non-reliance. Appellant sat through twelve hours of interrogation during which he answered hundreds of questions and listened to long exhortations addressing many different reasons why he should confess to the crimes. Throughout the early to middle parts of the interrogation, he consistently denied any involvement in the murders. Each time Sergeant Benton suggested that Appellant had already confessed to the murders, Appellant clearly stated "I wasn't there" or "I don't know what happened." Appellant maintained this position for hours. It was only after many more hours of statements that the officers "could help him" and "try to protect him" that Appellant changed his story.

The timing of the actual confession is critical. Because of the apparent malfunctioning of the tape recorder, we are unable to tell precisely when all the police inducements were complete, but sometime after 3:45 a.m. and before 6:00 a.m.,

just before Appellant confessed, Sergeant Ford uttered some of the more flagrant promises to Appellant, including statements regarding "leaving Salisbury after all this" and that Sergeant Ford had to "save" Appellant because people "are ready to come out here and do some bad things to [him]." [21] The closeness in time between these significant inducements and the actual confession leaves us unpersuaded that the State has met its burden to demonstrate Appellant did not rely upon them in deciding to make his confession.

We are also persuaded by the fact that the State has failed to point out any other, intervening factors that may have caused Appellant to confess when he did, or which may have attenuated the effect of the improper inducements. Unlike *Johnson*, in the present case there is no attenuation in time or circumstance, no change of environment, and no interruptive change of the interrogation team. Appellant confessed to virtually the same team of officers, in the same environment in which his entire interrogation took place, following twelve hours of interrogation.

The final factor that weighs in our analysis is the egregiousness of the officers' conduct. The State argues that the interrogation was "a classic example of effective police interviewing." The opposite is true. As evidenced by our holding, the tactics employed by the officers are counter-effective. In the present case, we are not upsetting Appellant's convictions because the interrogating officers merely stepped over the line of effective and permissible interrogation tactics. Rather, these officers disregarded interrogation guidelines in their quest to gain a confession. The State carries the burden to establish that Appellant's confession was made "free of any coercive barnacles." *See Hillard*, 286 Md. at 150, 406 A.2d at

---

21. Sergeant Fisher testified at the suppression hearing that Sergeant Ford made these remarks sometime after 3:45 a.m., but before Appellant confessed at 6:00 a.m. Of course, as Appellant argues, most of the statements we have recounted can be construed as threats as well as promises. We have not considered the police statements as threats for purposes of our analysis because, as promises alone, they rise to the level of actionable impropriety.

418. The State has failed to meet its burden, and therefore, we hold that the Circuit Court erred in denying Appellant's suppression motion as to the ultimate confession.[22]

## II.

*The Trial Judge's Ex Parte Communications with the Jury*

As recounted earlier in this opinion, the trial judge admitted having *ex parte* communications with the jury during Appellant's trial. As a result of the judge's disclosure of those communications, Appellant made a motion for mistrial, which was denied. Appellant argues that Maryland Rules 4–326(c)[23] and 4–231[24] required the trial judge to notify him and the

---

**22.** The scope of our holding does not embrace any inculpatory statements made by Winder earlier in the interrogation, before the "coercive barnacles" of the interrogators' actions may have attached, *e.g.*, Winder's response "I'd go to jail" to the question what he thought would happen if he told the "truth" about "that night." *Supra* at 6. On remand, the parties and the trial court are free to explore such prospects.

**23.** Maryland Rule 4–326(c) states:

The court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action.

**24.** Maryland Rule 4–231 provides, in pertinent part:

(a) When presence required. A defendant shall be present at all times when required by the Court. A corporation may be present by counsel.

(b) Right to be present-Exceptions. A defendant is entitled to be present at a preliminary hearing and every stage of trial, except (1) at a conference or a argument on a question of law; (2) when a nolle prosequi or stet is entered pursuant to Rules 4–247 and 4–248; or (3) at a reduction of sentence pursuant to Rules 4–344 and 4–345.

(c) Waiver of Right to be Present.—The right to be present under section (b) of this Rule is waived by a defendant:

(1) who is voluntarily absent after the proceeding has commenced, whether or not informed by the court of the right to remain; or

(2) who engages in conduct that justifies exclusion from the courtroom; or

(3) who, personally or through counsel, agrees to or acquiesces in being absent.

State's Attorney before speaking with the jury and that all communications with the jury must be on the record. Appellant asserts, under our common law, that he has a right to be present during all phases of his trial and the trial judge's action denied him this fundamental right and also violated the Maryland Rules. Appellant contends finally that the inappropriate actions of the trial judge did not constitute harmless error and, therefore, warrant reversal. Based on the record, it is evident that the judge acted improperly in this case and violated the Maryland Rules and our common law principles.

Because we reverse for the reasons stated in Part I of this opinion, we need not determine whether Appellant's proposed remedy is warranted also based on the trial judge's *ex parte* communications with the jury. We note only that the trial judge presiding over this case made a serious misjudgment. Moreover, we are inclined to believe it will not be repeated at any new trial of Appellant.

 The rules governing communications between the judge and the jury are basic and relatively simple to adhere to in practice. If a judge receives a communication from the jury or wishes to communicate with the jury, he or she is required to notify the parties. *See* Md. Rule 4–326(c). The communication with the jury shall be made in open court on the record or shall be made in writing and the writing shall become part of the record. *See* Md. Rule 4–326(c). Putting aside certain exceptions not relevant here, the defendant has a recognized right to be present during communications between the judge and the jury during his trial. *See* Md. Rule 4–231(b); *Stewart v. State,* 334 Md. 213, 224–25, 638 A.2d 754, 759 (1994); *Williams v. State,* 292 Md. 201, 211, 438 A.2d 1301, 1306 (1981)("a criminal defendant's right to be present at every stage of his trial is a common law right [and] is to some extent protected by the Fourteenth Amendment to the United States Constitution"). These rules are not abstract guides. They are mandatory and must be strictly followed. *See Taylor v. State,* 352 Md. 338, 344, 722 A.2d 65, 68 (1998); *Stewart,* 334 Md. at 222, 638 A.2d at 758.

In the past, we have reversed convictions based on judicial failures to grasp the importance of these fundamental rules. In *Stewart*, the trial judge spoke with a distressed juror in the doorway of the jury room. *Stewart*, 334 Md. at 230, 638 A.2d at 762. The communication involved a division of opinion among the jury. Without inquiring into the specifics of the division, the judge sent the jury back into the jury room to deliberate. The judge later informed counsel of the *ex parte* communication and counsel subsequently moved for a mistrial, which the judge later denied. The jury returned with a conviction.

We reversed the convictions on appeal based on the *ex parte* communication. We explained:

[a]ny communication pertaining to the action between the jury and the trial judge during the course of the jury's deliberations is a stage of the trial entitling the defendant to be present. The right is deemed "absolute," and a judgment of conviction ordinarily cannot be upheld if the record discloses a violation of the right. It is clear that the judge's failure to obtain [the defendant's] presence at his encounter with the juror ... was erroneous.

*Stewart*, 334 Md. at 224–25, 638 A.2d at 759.

On the question of whether the trial judge's mistake constituted harmless error, we held that, regardless of the judge's innocent motives in speaking with the juror or how unimportant the communication may have been, "the mere opportunity for improper influence in [the defendant's] absence prejudiced him." *Stewart*, 334 Md. at 229, 638 A.2d at 761. *See also Taylor*, 352 Md. at 354–55, 722 A.2d at 73 (trial judge's *ex parte* communication with juror regarding basic juror questions required reversal).

██ The trial judge in the present case summarized his recollection of what he said during the communications with the jury during the recess. The substance of the exchanges, as he related them, appear facially to be innocuous. Even if the communications were innocent or insignificant, however, they still potentially prejudiced Appellant. This lapse in

discretion by the trial judge disturbed the integrity of the record and prevented us and Appellant from scrutinizing effectively the improper communications on appeal. The mandatory nature of the rules governing judge-to-jury communications becomes heightened particularly during a capital sentencing proceeding. Enough said.

## III.

### *Redaction of Pre–Sentence Investigation*

We do not reach or decide this issue.

## IV.

### *Sufficiency of the Evidence for the Burglary Conviction*

Notwithstanding our holding that the Circuit Court erred in denying Appellant's suppression motion and permitting his confession to be admitted into evidence at trial, we also must consider Appellant's sufficiency of the evidence argument as to his burglary conviction. When a criminal defendant properly appeals the sufficiency of the evidence supporting his or her conviction on any count, Maryland appellate courts normally address the sufficiency issues even when that court decides to reverse the judgment of the trial court on another ground. The rationale for this is based on double jeopardy principles. If we were to hold that the evidence before the fact finder, including the improperly admitted evidence, was legally sufficient to support a burglary conviction, Appellant would be precluded from arguing successfully that the double jeopardy protection bars a retrial on that charge. This is so because

[w]hen a criminal defendant takes an appeal and succeeds in having his conviction reversed on a ground other than the sufficiency of the evidence, the Fifth Amendment's Double Jeopardy Clause does not preclude a retrial of the defendant on the same charges.

*State v. Kramer,* 318 Md. 576, 593, 569 A.2d 674, 682 (1990) (quoting *Huffington v. State,* 302 Md. 184, 189, 486 A.2d 200,

203 (1983)). *See also Warfield v. State,* 315 Md. 474, 502, 554 A.2d 1238, 1252 (1989). If, on the other hand, we hold that the evidence admitted at trial was insufficient to sustain the burglary conviction, then double jeopardy prohibits the retrial of Appellant for burglary because of original error committed by the trial court. *See Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1, 9 (1978) ("[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding").

When reviewing a sufficiency of the evidence challenge, it is not the function of the appellate court to undertake a review of the record that would amount to a retrial of the case. *See State v. Albrecht,* 336 Md. 475, 478, 649 A.2d 336, 337 (1994). Rather, the standard of review regarding the sufficiency of evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560, 573 (1979); *Oken v. State,* 327 Md. 628, 661, 612 A.2d 258, 274 (1992); *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830, 842 (1980). In other words, we review the evidence in the light most favorable to the prosecution and will reverse the judgment only if we find that no rational trier of fact could have found the essential elements of the crime. *See State v. Sowell,* 353 Md. 713, 726, 728 A.2d 712, 719 (1999); *Oken,* 327 Md. at 661, 612 A.2d at 274.

Applying this standard to the agreed statement of facts in this case, we hold there was sufficient evidence contained there to convict Appellant of burglary in the first degree. The statutory definition of burglary in the first degree provides that "a person may not break and enter the dwelling of another with the intent to commit a theft or crime of violence." Maryland Code, (1957, 1996 Repl.Vol., 1999 cum. supp.), Article 27, § 29;[25] *See also Conyers v. State,* 345 Md.

**25.** § 29. Burglary in first degree.

525, 557, 693 A.2d 781, 796 (1997). Statutory crimes of violence include abduction, arson in the first degree, kidnaping, voluntary manslaughter, mayhem and maiming, murder, rape, robbery, carjacking, first and second degree sexual offense, use of a handgun in the commission of a felony or crime of violence, attempts thereto, and first and second degree assault. *See* Maryland Code, (1957, 1996 Repl.Vol., 1999 cum. supp.), Article 27, § 643B(a).

■■■ The breaking element of burglary "may be satisfied where it is shown that there has been an 'actual' breaking, or the breaking occurred 'constructively,' through an entry gained by artifice, by fraud, conspiracy, or by threats." *Oken,* 327 Md. at 662, 612 A.2d at 274; *Brooks v. State,* 277 Md. 155, 159–160, 353 A.2d 217, 220 (1976); *Williams v. State,* 205 Md. 470, 477, 109 A.2d 89, 93 (1954). We have also defined constructive breaking to include "[e]very unlawful entry." *Brooks,* 277 Md. at 160, 353 A.2d at 220. The Court of Special Appeals has noted that:

> The breaking element is not limited to an outside door or window. If the outside door is open but the felonious design requires entrance into a part of the building which is closed, the making of an opening into that part of the house is a breaking.

*Arnold v. State,* 7 Md.App. 1, 4, 252 A.2d 878, 879 (1969).

Appellant argues there was insufficient evidence to prove he "broke" into the Mainors' home. He asserts that his conviction was based solely upon his confession to the police and Allan Mainor's testimony that John Mainor was security conscious and usually kept his doors locked. Appellant contends there was no "break" because his statements to the police do not admit, nor indicate, a breaking of the Mainors' house, and that John Mainor's security habits are irrelevant. In support

---

(a) *In general.*-A person may not break and enter the dwelling of another with the intent to commit theft or a crime of violence.

(b) *Penalty.* A person who violates this section is guilty of the felony of burglary in the first degree and on conviction is subject to imprisonment for not more than 20 years.

of his argument, Appellant contends his statements to the police are "more susceptible of an inference that [Appellant] walked through a door left open by the Mainors than it is that [Appellant] broke into the house."

We find Appellant's arguments to be unpersuasive. From the record before the Circuit Court, a rational trier of fact could find the essential elements of first degree burglary beyond a reasonable doubt. *See Sowell,* 353 Md. at 726, 728 A.2d at 719; *Oken,* 327 Md. at 661, 612 A.2d at 274. According to the agreed statement of the facts, the following occurred as Appellant approached the Mainors' residence:

At that point he observed Christie Lee Mainor walk into the side garage door. The [Appellant] admitted that he walked up behind her and she screamed. The [Appellant] then said that he and Christie, Christie Mainor, were in the garage and that Mr. John Mainor came out of the kitchen with a knife. The [Appellant] said Mr. Mainor told Christie to get inside the residence, that John Mainor pushed the [Appellant] and, according to the statement of the [Appellant], a struggle then ensued over the knife at which time the [Appellant] indicated he was cut. The [Appellant] said that he got the knife away from Mr. Mainor and then cut Mr. Mainor on the neck.

The [Appellant] said Mr. Mainor then located the hammer and struck the [Appellant] on his leg. The [Appellant] said that he got the hammer away from Mr. Mainor and the [Appellant] then told the troopers that he told Mr. Mainor to get into the house.

According to the [Appellant's] statement, Mr. Mainor went into the house and began knocking things off of the counter. I would note that Dr. Locke indicated that the injury to the skull of Mr. John Mainor would initially cause a loss of equilibrium and difficulty with balance.

Going on with the [Appellant's] statement, he indicated that all three victims were screaming and yelling and that while he was holding the knife he told them to all sit down and shut up. The [Appellant] stated to the troopers that at

that point the Mainors were on the couch, meaning John and Geraldine Mainor were on the couch, but that he did not know where Christie was.

A rational fact finder could conclude that Appellant violently struggled with John Mainor in order to gain access to the Mainors' residence. Appellant admitted that he took a knife away from John Mainor and cut him on the neck. He then took the hammer from John Mainor and, given John Mainor's loss of balance upon re-entering his residence, Appellant most likely hit him in the head with a hammer. It could be concluded also that Appellant ordered John Mainor "to get into the house." This command occurred while Appellant was armed with a knife and, in all likelihood, a hammer, after he cut John Mainor with the knife, and, presumably, hit him in the head with the hammer. Our analysis is unaffected by the fact that the "break" did not occur at the outside garage door because the "breaking" of an inner door to a dwelling is sufficient for burglary. *See Arnold,* 7 Md.App. at 4, 252 A.2d at 879. The agreed facts indicate that Appellant gained access to the Mainors' residence by force, while armed with both a knife and hammer, thus constituting a "constructive break." *See Oken,* 327 Md. at 662, 612 A.2d at 274.

In *Hebron v. State,* we stated an "entry occurs when 'any part of ... [the trespasser's] person is within the house' " and that the entry is "sufficient if any part of the actor's person intruded, even momentarily, into the structure." *See Hebron,* 331 Md. 219, 236, 627 A.2d 1029, 1037 (1993). According to Appellant's statement to the police, he entered the Mainors' home through the kitchen door following his altercation with John Mainor. The "entry" requirement for first degree burglary was fulfilled.

■ We next consider whether there was sufficient evidence from which a rational fact finder could have concluded that Appellant had the requisite intent to commit a "crime of violence" as he was "breaking and entering" the Mainors' residence. When analyzing the intent to commit a "theft or crime of violence," the actual intention at the time of the

breaking is controlling. *See Reed v. State,* 316 Md. 521, 526, 560 A.2d 1104, 1106 (1989); *Pearre v. State,* 237 Md. 622, 624, 206 A.2d 249, 250 (1965). As we stated in *Reed,* "it is not burglary if the intent is formed after the breaking and entering are completed." *Reed,* 316 Md. at 526, 560 A.2d at 1106.

Because of the frequent practical difficulties in proving directly an accused's intention when he or she breaks into a dwelling, we have held that the intention at the time of the break may be inferred from the circumstances. *See Reed,* 316 Md. at 527, 560 A.2d at 1107; *Ridley v. State,* 228 Md. 281, 282, 179 A.2d 710, 711 (1962). More specifically, we have stated that "[f]inding the requisite intent to [commit a violent crime] is ... never a precise process for intent is subjective, and it must therefore be inferred from the circumstances of the case." *Reed,* 316 at 527, 560 A.2d at 1106–07. A trier of fact therefore may examine the surrounding circumstances, including an accused's acts and declarations, in order to reach a rational conclusion regarding the intention of the accused. *See Ridley,* 228 Md. at 282, 179 A.2d at 711; *Rahe v. State,* 222 Md. 508, 510, 161 A.2d 696, 697 (1960); *Johnson v. State,* 5 Md.App. 540, 545, 248 A.2d 663, 666–67 (1968). A "surreptitious or forceful breaking" strongly indicates criminal intent. *See Reed,* 316 Md. at 527, 560 A.2d at 1107. We also have explained that the most conclusive evidence in determining whether an accused intended to commit a violent crime is the commission of the violent crime itself. *See id.*

Appellant's statement to the police permitted a rational trier of fact to find beyond a reasonable doubt that Appellant had the requisite intent to commit a violent crime when he "broke and entered" the Mainors' home. *See Oken,* 327 Md. at 661, 612 A.2d at 274. Appellant's violent struggle with John Mainor in the garage, and the forceful nature of his "break", constitutes a first degree assault prior to entering the Mainor residence. This first degree assault, prior to entering the Mainors' home, strongly suggests Appellant intended to perpetrate a violent crime upon entering the Mainor residence. *See Reed,* 316 Md. at 527, 560 A.2d at 1107.

· Based on the agreed statement of facts, a rational fact finder could have inferred that Appellant committed an assault in the first degree and murder in the first degree, both obvious "violent crimes", while inside the Mainor residence. *See* Maryland Code, (1957, 1996 Repl.Vol., 1999 cum. supp.), Article 27, § 643B(a). Appellant recounted in his statements in the agreed statement of facts that, upon "breaking and entering" the Mainors' residence,

.... that all three victims were screaming and yelling and that while he was holding the knife he told them to all sit down and shut up. The [Appellant] stated to the troopers that at that point the Mainors were on the couch, meaning John and Geraldine Mainor were on the couch, but that he did not know where Christie was.

The [Appellant] stated that he recalls someone running through the house, struck him with a chair, and that it may have been Christie. The [Appellant] further indicated that at some point he blanked out, that he did not know exactly what occurred, but that he said after whatever occurred, they were all dead. He further indicated that he sat on the floor and that he knew they were dead because they were not screaming or moving.

This evidence demonstrates that Appellant, upon entering the Mainors' residence, further assaulted and then murdered John, Geraldine, and Christine Mainor. We hold that the evidence supported a rational trier of fact finding the essential elements of burglary in the first degree beyond a reasonable doubt. *See Sowell*, 353 Md. at 726, 728 A.2d at 719; *Oken*, 327 Md. at 661, 612 A.2d at 274.

### V.

*Restriction of Evidence During Sentencing Proceeding*

### VI.

*Voir Dire Omissions*

We do not reach or decide these issues.

JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR A NEW TRIAL. COSTS TO BE PAID BY WICOMICO COUNTY.

Judge CATHELL concurs in the result only.